IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN IPHONE 17 CURRENTLY LOCATED AT 15 OAK GROVE ROAD, VASSALBORO, ME 04989 | Case No. 2:26-mj-00099-KFW |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Craig S. Mehrmann, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since February 2023. I am currently assigned to the Boston Division, Portland, Maine Resident Agency on the FBI Maine Safe Streets Task Force (SSTF). I was assigned as the lead FBI health care fraud investigator in Maine from July 2023 through September 2025 before being reassigned to SSTF, where I continue to investigate crimes involving health care fraud, among other offenses.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

3. The property to be searched is an iPhone 17, serial number CG42P4DW63, hereinafter the "Device," further described in Attachment A. The Device is currently

located at the Maine State Police Digital Forensics Lab at 15 Oak Grove Road, Vassalboro, ME 04989.

## PURPOSE OF THE AFFIDAVIT

4. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

5. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

6. Based on my training, and experience, and the facts set forth in this affidavit, I submit there is probable cause to believe that Adel Al Rashid and others have committed the following federal offenses: 18 U.S.C. 1035 (False Statements Relating to Health Care Matters); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1347 (Health Care Fraud); 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud; Wire Fraud) and 42 U.S.C. § 1320a-7b (Anti-Kickback Statute) ("Subject Offenses").

## BACKGROUND

7. The United States, including the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the Department of Health and Human Services Office of the Inspector General ("HHS-OIG"), and Homeland Security Investigations ("HSI") is investigating health care fraud occurring in the District of Maine in connection with Medicaid-funded services provided by Personal Care Agencies ("PCAs"), including Community Home Health Care LLC ("Community") and Decent

Care Services LLC, formally named “Decent Health Care LLC” (“Decent”), among other PCAs.

### *Medicaid and MaineCare*

8. Medicaid is a health care benefit program jointly funded with federal and state funds. Medicaid pays for health care benefit services for eligible low-income individuals. It is administered by the Department of Health and Human Services (“HHS”) and by state agencies. In Maine, Medicaid is part of MaineCare and is administered by the Maine Department of Health and Human Services (“MDHHS”).

9. MaineCare is a health care benefit program as that term is defined in Title 18, United States Code, Section 24(b) as well as a “Federal health care program,” as defined by Title 42, United States Code, Section 1320a-7b(f). Health care providers that provide services to MaineCare beneficiaries are referred to as MaineCare “providers.” To participate in MaineCare, providers are required to submit an application in which the provider agrees to comply with all MaineCare related laws and regulations. If MaineCare approves the application, the provider is assigned a MaineCare “provider number.” A health care provider with a MaineCare provider number can file claims with MaineCare to obtain reimbursement for services rendered to MaineCare beneficiaries.

10. Individuals who qualify for MaineCare are commonly referred to as “members” or “beneficiaries.” Each beneficiary receives a MaineCare identification number.

11. State rules governing MaineCare are set forth in the MaineCare Benefits Manual ("MBM") which is publicly accessible on the Maine Department of State website.[1]

### *How Providers Bill MaineCare*

12. Health care providers who are covered entities under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") are required to obtain a National Provider Identifier ("NPI"). An NPI is a unique 10-digit number used to identify providers. The Centers for Medicare and Medicaid Services ("CMS") has developed the National Plan and Provider Enumeration System ("NPPES") to assign these unique identifiers. Providers who submit HIPPA covered transactions, such as claims, are covered entities. Accordingly, PCAs are required to obtain NPI numbers. CMS provides a public online registry ("NPI Registry") which can be used to search for providers and NPI numbers.

13. To bill MaineCare, a provider may submit claims to obtain reimbursement for services provided to beneficiaries. A MaineCare claim is required to set forth, among other things: the beneficiary's name, identifiers, and diagnoses; procedure codes for the services that were performed; the date the services were performed; the place the services were performed; and any applicable code modifiers for the claim. When a claim is submitted, the provider certifies that: (1) the contents of the form are true, correct and complete; (2) the form is prepared in compliance with the laws and regulations governing MaineCare; and (3) the contents of the claim were medically necessary.

---

[1] https://www.maine.gov/sos/rulemaking/agency-rules/mainecare-benefits-manual [Last visited March 24, 2026].

14. The Healthcare Common Procedure Coding System ("HCPCS") is a standardized set of medical codes used by healthcare providers to describe services, procedures, medical supplies, and equipment in claims.

15. Providers may submit claims using a form known as the CMS 1500 or electronically. The CMS 1500 form includes, among other information, the name and provider number of the provider who rendered the service; the name of the patient who received the service; the date the service was performed; a code delineating where the service was provided; the procedure that was rendered, and the diagnosis of the patient's condition for which the service was rendered. Claims submitted electronically include the same information.

16. The MaineCare Services web site contains billing instruction guides, which are accessible to providers as well as the public.[2] In addition, the Office of MaineCare Services publishes Rate and Fee Schedules which list the billing rates applicable to each unit of service provided under specified HCPCS codes. This investigation concerns claims submitted to MaineCare using the following HCPCS codes:

a. **T1019** is the HCPCS code for "Personal care services, per 15 minutes, not for an inpatient or resident of a hospital, nursing facility, icf/mr or imd, part of the individualized plan of treatment (code may not be used to identify services provided by home health aide or certified nurse assistant)." The applicable MaineCare Rates and Fee Schedule indicates that this code applies to "Personal Care Services (Agency PSS)."

[2] Instructions for submitting claims using the CMS 1500 form are found at https://mainecare.maine.gov/Billing%20Instructions/CMS_1500_Billing_Instructions_Guide_v19.0_20260127.pdf [Last Visited March 24, 2026].

b. **T1017** is the HCPCS code for "Respite care services, up to 15 minutes." The applicable MaineCare Rates and Fee Schedule indicates that this code applies to "Respite Care, In the home (PSS)."

17. Each of the above services are billed in 15-minute units. When submitting a claim for one of these services, the provider enters the number of units of service provided, which MaineCare uses to determine how much to pay the provider, in accordance with the applicable rates and fee schedule. For a variety of reasons, claims may be denied prior to payment to the provider or reversed after payment.

***Personal Care Services***

18. **Personal Care Services (also known as Personal Support Services)**, include Personal Care Services delivered by an agency related to a member's physical requirements for assistance with Activities of Daily Living, including assistance with Health Maintenance Activities. Personal Care Services are not authorized for the sole purposes of aiding with Instrumental Activities of Daily Living. Personal Care Services may include Instrumental Activities of Daily Living when certain conditions are met. MBM Chapter II, Section 19.04-9.

19. **Respite Services** are provided to a member who is unable to care for him or herself, and who requires care on a short-term basis due to the temporary absence of, or to provide relief for, the caregiver who normally provides the care. MBM Chapter II, Section 19.04-16.

20. Personal care services and respite care services may be rendered pursuant to various sections of the MaineCare Benefits Manual, depending on the medical eligibility and diagnosis of the beneficiary. This affidavit concerns personal care and

respite services purportedly rendered pursuant to Chapter II, Section 19 (Home and Community Benefits for the Elderly and Adults with Disabilities).

21. **Personal Care Agency ("PCA")** is a business entity or subsidiary of a business entity licensed by the Maine DHHS that hires and employs direct access personnel to work in direct contact with clients to provide assistance with Activities of Daily Living and Instrumental Activities of Daily Living in the places in which they reside, either permanently or temporarily. Personal Care Agency Licensing Rules, 10-144 C.M.R. Ch. 129. §1(B)(27). PCAs may not provide services or accept any payment for services unless first licensed by Maine DHHS. 10-144 C.M.R. Ch. 129. §2(A)(1).

22. **Activities of Daily Living ("ADLs")** are basic activities of self-care performed by individuals on a daily or frequent basis necessary for independent living and may include activities such as: bed mobility, transfer, locomotion, eating, toilet use, bathing, and dressing. MBM Chapter II, Section 19.01-1.

23. **Health Maintenance Activities** assist the member with Activities of Daily Living and Instrumental Activities of Daily Living, and additional activities specified in this definition. These activities are performed by a designated caregiver for an individual who would otherwise perform the activities if he or she were physically or cognitively able to do so and enable the member to live in his or her home and community. These additional activities include, but are not limited to, catheterization, ostomy care, preparation of food and tube feedings, bowel treatments, administration of medications, care of skin with damaged integrity, and occupational and physical therapy activities such as assistance with prescribed exercise regimes. MBM Chapter II, Section 19.01-1.

24. **Instrumental Activities of Daily Living ("IADLs")** are tasks necessary for maintaining a member's immediate environment, such as preparing and serving meals, washing dishes, dusting, making bed, pick-up living space, sweeping, vacuuming and washing floors, cleaning toilet, tub and sink, appliance care, changing linens, refuse removal, shopping for groceries and prepared foods, storage of purchased groceries, and laundry, either within the residence or at an outside laundry facility. MBM Chapter II, Section 19.01-18.

25. **Member Eligibility:** Members must meet the general financial eligibility requirements for enrollment in MaineCare. In addition, a member must meet medical eligibility requirements specified in one of the sections of the MaineCare Benefits Manual covering Personal Care Services. Under certain sections of the MaineCare benefits Manual, a member's medical eligibility is determined by an Assessing Services Agency.

26. **Assessing Services Agency ("ASA"):** An ASA provides services to the Maine DHHS for medical eligibility determinations, Authorized Plan of Care development and prior authorization of covered services. The assessor at the ASA conducts face-to-face assessments, using the Department's Medical Eligibility Determination (MED) form. A member's medical eligibility is based upon a member's assessment outcome. If a member is determined to be eligible for personal care services, the ASA develops the Authorized Plan of Care with the member and specifies all services to be provided, including type of services and number of hours for all provider types. MBM Chapter II, Section 19.01-3.

27. **Authorized Plan of Care:** An authorized plan of care is authorized by the Assessing Services Agency, or Maine DHHS, and specifies all services to be delivered

to a member, including the number of hours for each covered service, and the provider type to deliver each service. The Authorized Plan of Care must reflect the needs identified by the assessment, considering the member's goals, preferences, living arrangement, informal caregiving support provided by family and friends, and services provided by other public and private funding sources. MBM Chapter II, Section 19.01-6.

28. Delivery of personal support and respite care services "to an individual member (or household) may not exceed forty (40) hours per week from one individual staff member." MBM Chapter II, Section 19.06.

***Personal Support Specialists***

29. **Personal Support Specialists ("PSS")** are individuals who provide personal care services. "A PSS must be employed by, or acting under a contractual relationship with, a licensed home health agency or by a registered personal care agency. A family member who meets the requirements of this Section may be a PSS and receive reimbursement for delivering personal support services, with the exception of the MaineCare member's spouse, or the parent (including stepparent) of a minor child who is a MaineCare member." MBM Chapter II, Section 19.08-8.

30. **Training Requirements**: Individuals employed as a PSS must undergo background checks and meet certain training requirements. "An individual without the required training may be hired and reimbursed for delivering personal support services as long as the individual enrolls in a certified training program within sixty (60) days of hire and completes training and examination requirements within nine (9) months of employment and meets all other requirements. If the individual fails to pass the examination within nine (9) months, reimbursement for his or her services must stop until such time as the training and examination requirements are met." MBM Chapter

II, Section 19.08-8. These training requirements may be satisfied, among other ways, when the PSS "[h]olds a valid certificate of training as a Personal Support Specialist issued as a result of completing the Department approved Personal Support Specialist training curriculum and passing the competency-based examination of didactic and demonstrated skills. The training course must include at least fifty (50) hours of formal classroom instruction, demonstration, return demonstration, and examination. Tasks covered under this Section must be covered in the training; or" is "a Personal Support Specialist who successfully completed a Department-approved curriculum prior to September 1, 2003." MBM Chapter II, Section 19.08-8.

31. Provider agencies are responsible for "[a]ssuring that a PSS meets the training, competency, and other requirements of this Section, and maintaining documentation of how each requirement is met in the PSS's personnel file, including: evidence of orientation when applicable, check of the CNA and Direct Care Worker Registry, criminal background check, and the verification of credentials including the certificate of training and/or verification of competency." MBM Chapter II, Section 19.08-8. Additionally, provider agencies are responsible for providing supervision to PSS with an initial visit to a member's home and supervisory visits at the member's residence at least every six months, to "observe and verify PSS competency in the delivery of the service." MBM Chapter II, Section 19.08-8. "The documentation of supervisory visits shall be maintained in the PSS's employee file." MBM Chapter II, Section 19.08-8.

***Electronic Visit Verification***

32. **Electronic Visit Verification ("EVV"):** Section 12006 of the 21st Century Cures Act (codified at 42 U.S.C.A. § 1396b) mandates that states implement an

EVV system for all Personal Care Services (PCS) and Home Health Care Services (HHCS) that require an in-home visit by a provider. Pursuant to this requirement, MaineCare implemented the following rule: "Effective January 1, 2020, every provider of the following services: Home Health Services, Personal Care Services (also known as Personal Support Services), Attendant Services, and Respite Services in the home – must utilize an Electronic Visit Verification system ("EVV"). Visits conducted as part of such services must be electronically verified with respect to: the type of service performed; the individual receiving the service; the date of the service; the location of the service delivery; the individual providing the service; and the time the service begins and ends. Providers may utilize the Maine DHHS EVV system at no cost, or may procure and utilize their own EVV system, so long as data from the provider-owned EVV system can be accepted and integrated with the Maine DHHS EVV system and otherwise is compatible." MBM Chapter II, Section 19.08-7. The Maine DHHS EVV system is Sandata, which is operated by Sandata Technologies, LLC.

33. As allowed by the provisions of 42 U.S.C.A. § 1396b, MDHHS requested and received approval from CMS for an exemption from full compliance with EVV requirements until January 1, 2021, on the basis that Maine had made good faith efforts toward implementing them.[3] Subsequently, in January 2021 Maine submitted an attestation to CMS that it had complied with EVV requirements. In January 2021, CMS determined that Maine had met the EVV implementation requirements.

34. Use of the EVV system does not replace the need for providers to submit claims for payment to MaineCare. However, a claim for personal care services must be

[3] CMS Letter to MDHHS approving request for exemption dated September 26, 2019. https://www.medicaid.gov/medicaid/home-community-based-services/downloads/me-evv-gfe-appvl-ltr.pdf [Last Visited March 24, 2026].

supported by a verified EVV visit record before the claim is processed and paid. As of "January 1, 2021, MaineCare claims for services that require EVV are held with no payment for up to 30 days if no EVV verified visit record is found that matches the claim."[4] During the thirty-day period, the claim will continue to process if a matching verified EVV visit record is found.

### *Sandata EVV System*

35. My understanding of the Sandata EVV system is based on conversations with individuals familiar with the system, and my review of EVV participant guides published by the Office of MaineCare Services.[5] Users access the Sandata EVV system through an application installed on a mobile device or through an internet-based platform. The Sandata EVV system is used to record data concerning the date, time and location of visits, and to verify that services were provided. The Sandata EVV system is not used to enter clinical information concerning care provided to a client.

36. An administrator at the provider agency has the ability to create user accounts for their employees to access the Sandata EVV system. The administrator can also assign roles and system privileges to employee users. Roles and system privileges determine what data the user is permitted to access and enter. Each user is provided with a unique password and username (typically an email address) to access their account. The EVV system records information concerning each user, including their name and identifiers, as well as email addresses and phone numbers.

---

[4] Maine DHHS, Electronic Visit Verification (EVV) Attestation, Dated April 20, 2021, at https://mainecare.maine.gov/EVV%20Guides%20and%20Manuals/Electronic%20Visit%20Verification%20Attestation.pdf [Last visited March 24, 2026].

[5] These manuals are available at https://mainecare.maine.gov/EVV%20Guides%20and%20Manuals/Forms/Publication.aspx [Last visited March 24, 2026].

37. PSS workers log service times using the Sandata EVV system using the following methods:

a. **Mobile Visit Verification ("MVV")**: PSS workers use the Sandata application on a mobile device to record the start time ("call-in") and the end time ("call-out") of service visits to beneficiaries. To call in at the start of a visit, a worker logs in to the application with a username and password. The worker enters the client's identifier number, selects a service type, and begins the visit by pressing an on-screen button. At the end of the visit, the worker presses an on-screen button to complete the visit. The worker then hands the device to the client, and the client selects from on-screen buttons to deny or confirm the visit and visit time. The client then verifies their identity by entering their digital signature or by pressing an on-screen button to record their voice and stating their name and the date.

b. **Telephony Visit Verification ("TVV"):** The TVV system is available as an alternative to the MVV system call-in or call-out process. TVV is utilized in cases where MVV is not available (e.g., the device has not been charged, connectivity issues, because the device has not yet been delivered, etc.). An employee can start a visit using MVV and complete the visit using TVV and vice versa, if required. When using the TVV system, employees can call in or call out from any phone to a designated number. To call-in at the start of a visit, a worker enters their unique worker identification number and selects the option for call-in. To end the visit, the employee calls the designated number, enters their worker identification number,

enters the client's identification number, and selects the service type. The worker then hands the phone to the client. The client verifies or denies the service, and their voice is recorded to verify their identity.

38. **Information Recorded:** Each visit entered using the MVV or TVV methods records information including but not limited to the time and date of the visit, service type, worker identifiers, client identifiers, and verification data including the client's voice or signature. For visits entered using MVV, the Sandata EVV system records the GPS location of the device, which was used to call-in and call-out. For visits entered using TVV, the Sandata EVV system records the telephone number of the phone used to call the designated number to call-in and call-out.

39. **Exceptions:** If a EVV record is missing certain required information, or other errors are present, the Sandata EVV system generates an "exception." Exceptions include, among others, instances where the client's digital signature or voice recording is missing; the client or worker's identity is unknown; the client did not verify the start or end times of the visit, or the visit lacks call-in or call out entries. In addition, a GPS distance exception occurs when the location recorded at the call-in or call-out exceeds the allowable distance tolerance of 2,640 feet from the client's home or other address associated with the client in the Sandata EVV system.

40. **Identifying and Correcting Exceptions:** The Sandata EVV system provides a web-based platform for administrators to identify and correct visit records that have exceptions. Exceptions must be fixed or acknowledged before a record is considered a verified visit. Visit adjustments or corrections require the user to select a reason code and add an explanation to the record. These reasons include, among others, that a caregiver made an error, there was an issue with the mobile device or telephone,

the service was rendered outside the home, or that the member refused to verify the service.

41. **Manual Visit Entry:** In instances where the PSS worker does not call in or out using the MVV or TVV methods, an employee of the provider agency who has been granted certain access privileges can manually enter information concerning a visit. In such cases, an employee with access privileges uses the web-based EVV platform to enter call in and call out times. The EVV system records which user account was used for the manual visit entry.

### ***Relevant Entities and Individuals***

42. **Community Home Health Care LLC ("Community")** is a company formed under the laws of Maine. Publicly available records from the Maine Department of the Secretary of State, Bureau of Corporations, Elections and Commissions indicate that Community was incorporated on or about April 4, 2016. The records identify Noora A. Abd (Abd) as the "Clerk/Registered Agent." The records further indicate that Community has a principal place of business at 184 Maine Street, Ste. 2d, South Portland, Maine and a mailing address at 41 Cathedral Oaks Drive, Biddeford, Maine.

43. The NPI registry indicates that Abd is the owner of Community.

44. In or about May 2016, Community enrolled in MaineCare. Community has been licensed as a Personal Care Agency in Maine since 2016.

45. On or about May 3, 2016, Abd signed the MaineCare/Medicaid Provider Agreement on behalf of Community as its "Owner." As part of that Agreement – and as also reflected in several subsequent Provider Agreements executed by Abd (including on or about January 7, 2025) – Abd acknowledged that reimbursement under MaineCare "is contingent on the Provider's, its agents' and employees' compliance with applicable

Federal and State Medicaid laws and regulations" including that "[t]he Provider shall be reimbursed by the Department only for…services actually provided".

46. Claims data from 2016 through 2024 show that MaineCare payments to Community for T1019 personal support services claims increased from approximately $53,000 in 2016, to approximately $9,820,000 in 2024.

47. **Decent Care Services LLC, formerly known as Decent Health Care LLC ("Decent")** is a company formed under the laws of Maine. Publicly available records from the Maine Department of the Secretary of State, Bureau of Corporations, Elections and Commissions demonstrate that Decent was incorporated on or about October 11, 2018. The records list Faysal Kalayaf Manahe ("Manahe") as the "Clerk/Registered Agent." The records indicate that Decent has a principal place of business at 179 Mount Vernon Avenue, Ste. 5, Augusta, Maine, and a mailing address at 41 Cathedral Oaks Drive, Biddeford, Maine.[6]

48. The NPI registry lists Manahe as the "Admin" of Decent.

49. In or about November 2018, Decent enrolled in MaineCare but later allowed its enrollment to lapse. In about December 2023, Decent re-enrolled in MaineCare. Since re-enrolling, Decent has been licensed as a Personal Care Agency in Maine since February 5, 2024.

50. On or about November 26, 2018, Manahe signed the MaineCare/Medicaid Provider Agreement on behalf of Decent as its "Owner." As part of that Agreement – and as also reflected in several subsequent Provider Agreements executed by Manahe (including on or about February 18, 2024) – Manahe acknowledged that reimbursement

[6] Decent's mailing address is the same as that provided for Community.

under MaineCare "is contingent on the Provider's, its agents' and employees' compliance with applicable Federal and State Medicaid laws and regulations" including that "[t]he Provider shall be reimbursed by the Department only for…services actually provided".

51. Claims data show that Decent received no MaineCare payments for T1019 personal support services claims from 2016 through 2023 and received approximately $1,290,000 for such claims in 2024.

52. Manahe and Abd are believed to be married.[7] Maine BMV driver's license records indicate that both Manahe and Abd reside at 41 Cathedral Oaks Drive, Biddeford, Maine. Manahe has also been employed by Community as a PSS.

53. Adel Al Rashid ("Al Rashid") is employed by Community as a PSS to perform personal support services and respite care services. As described herein, he resides at 45 Cushnoc Drive, Augusta, Maine.

54. Client 1 is a MaineCare beneficiary who resides at 27 Brooklawn Avenue, Augusta, Maine. I have reviewed MaineCare claims records for the period from approximately August 2020 to the present. These records indicate that Community submitted claims for personal care services for Client 1 from approximately August 2020 to present. I have also reviewed medical eligibility determinations for Client 1, for the period from approximately October 2020 to the present. These records show that during this period, Client 1 was found eligible for home and community benefits for the elderly

[7] In January 2022, Manahe was named as a defendant in an Indictment charging him and other Defendants with Conspiracy in Restraint of Trade, in violation of 15 U.S.C. § 1. *See United States v. Manahe et al*, No. 2:22-cr-00013-JAW, Dkt. 1. Manahe and his co-defendants were found not guilty following a jury trial in that matter. Dkt. 247. Manahe's Counsel stated during his opening statement at trial that Manahe's "wife Noor Abd is the owner of Community Home Health Care." Dkt. 215 at 37. However, this evidence was not elicited at trial.

and adults with disabilities. These benefits include personal care services rendered pursuant to MBM Chapter II, Section 19. EVV records contain entries purporting to show that Al Rashid began providing personal support services to Client 1 as an employee of Community no later than November 2020.[8]

## PROBABLE CAUSE

55. As detailed below, this investigation has revealed evidence of a scheme to defraud MaineCare involving false claims for personal support and respite care services purportedly provided by Al Rashid to Client 1. Specifically, EVV records purported to show that Al Rashid provided personal support and respite care services to Client 1 at her residence on multiple dates and times, where surveillance revealed that Al Rashid was not present or only briefly visited her residence. Additionally, surveillance revealed that Al Rashid seldom visited Client 1's residence, and that visits were typically brief despite EVV entries which indicated he was spending hours providing personal care at her residence on numerous dates. Corresponding claims records indicate that Community submitted claims to MaineCare, and received payment, for personal support and respite care services purportedly provided to Client 1 by Al Rashid.

### *Surveillance of Al Rashid*

56. Remote video surveillance was conducted from a pole camera installed outside Al Rashid's residence at 45 Cushnoc Drive, Augusta, Maine, from April 3, 2024, through approximately June 12, 2024. Remote video surveillance was conducted concurrently from a pole camera installed outside 45 Cushnoc Drive, Augusta, Maine

[8] Visits pre-dating implementation of the EVV system would not be reflected in EVV records.

and Client 1's residence at 27 Brooklawn Avenue, Augusta Maine, from approximately March 4, 2025, through approximately February 13, 2026.

57. Agents are familiar with Al Rashid's appearance based on review of Maine driver's license photographs, as well as from physical and video surveillance performed during this investigation. The below images show Al Rashid's current and most recent former Maine driver's license photos:





58. After the installation of the pole camera outside 45 Cushnoc Drive in April 2024, agents conducted physical surveillance of Al Rashid. Exhibit 1, which is attached hereto and incorporated herein, contains photographs taken during physical surveillance, along with screenshots of remote surveillance taken during the same date.

59. Al Rashid's residence and Client 1's residence are located on opposite sides of the Kennebec River in Augusta, Maine. The drive from Al Rashid's residence to Client 1's residence is approximately 3.1 miles with a driving time of 8 minutes. A Google Maps printout showing the drive from Al Rashid's residence to Client 1's residence is attached hereto and incorporated herein as Exhibit 2.

60. Maine Bureau of Motor Vehicles ("BMV") records indicate that the following vehicles were registered to Al Rashid and his wife Sura Al Mohammed ("Al Mohammed") during the period of surveillance:[9]

a. A White Honda Ridgeline pickup truck, Maine Registration 6644UN, registered to Al Rashid at 92 Northern Avenue, Apt. 2, Augusta, Maine;[10]

b. A White Honda Pilot SUV bearing Maine registration 4030WM, registered to Al Mohammed, at 45 Cushnoc Drive, Augusta, Maine;

c. A White Honda Civic, Maine registration 96ZH, registered to Al Rashid at 92 Northern Avenue, Apt. 2, Augusta, Maine;

d. A Gray 2022 Dodge Ram, Maine registration 497KAV, registered to Al Rashid at 116 Winthrop Street, Augusta, Maine, effective September 1, 2025.

61. As further described below, agents have observed Al Rashid operating the Honda Ridgeline bearing Maine registration 6044UN and the other vehicles referenced above. Agents often observed the Honda Ridgeline, and the other vehicles parked at Al Rashid's residence in remote video surveillance footage. Remote surveillance screenshots showing Al Rashid with the Honda Ridgeline are included in Exhibit 1.

62. As previously noted, FBI agents and analysts identified numerous occasions where Al Rashid's physical location was inconsistent with EVV entries which reported that he provided personal support services to Client 1 at her residence. Some

[9] This is not meant to be an exhaustive list of all vehicles that may have been registered to Al Rashid or his wife Al Mohammed and is only intended to provide context to the surveillance summarized in this affidavit.

[10] As noted herein, Al Rashid's vehicles are registered to him at addresses other than 45 Cushnoc Drive, Augusta, Maine. However, Al Rashid has been frequently observed at 45 Cushnoc Drive, which I believe to be his actual or primary residence.

examples of instances where Al Rashid's observed location conflicted with EVV entries purporting that services were provided at Client 1's residence are set forth below. Representative screenshots from the dates of remote video surveillance referenced in this affidavit are shown in Exhibit 3, which is attached hereto and incorporated herein. Each screenshot contains a notation indicating the location of the surveillance camera, as well as the date and time of the footage.

***April 7, 2024 – April 13, 2024***

63. The following chart shows Al Rashid's EVV entries when he was purportedly providing services to Client 1 at her residence during the week of April 7, 2024 – April 13, 2024.

| SERVICE | EMPLOYEE | IN CALL | OUT CALL | BILL TIME (Minutes) |
|---|---|---|---|---|
| T1019 | Al Rashid, Adel | 4/7/2024 5:58:32 PM | 4/7/2024 11:00:35 PM | 302 |
| T1019 | Al Rashid, Adel | 4/8/2024 5:58:06 PM | 4/8/2024 11:00:06 PM | 302 |
| T1019 | Al Rashid, Adel | 4/9/2024 5:58:06 PM | 4/9/2024 11:00:43 PM | 302 |
| T1019 | Al Rashid, Adel | 4/10/2024 6:00:04 PM | 4/10/2024 11:00:05 PM | 300 |
| T1019 | Al Rashid, Adel | 4/11/2024 5:58:17 PM | 4/11/2024 11:35:27 PM | 337 |
| T1005 | Al Rashid, Adel | 4/12/2024 4:57:32 PM | 4/12/2024 7:00:25 PM | 123 |
| T1019 | Al Rashid, Adel | 4/12/2024 7:00:48 PM | 4/12/2024 11:02:10 PM | 242 |
| T1005 | Al Rashid, Adel | 4/13/2024 2:58:09 PM | 4/13/2024 5:16:26 PM | 138 |
| T1019 | Al Rashid, Adel | 4/13/2024 5:16:50 PM | 4/13/2024 11:20:50 PM | 364 |
| Total Bill Time (Al Rashid) | | | | 2410 (minutes) |

64. MaineCare claims records reflect that Community submitted a claim for

for 237 units (3,555 minutes) of personal support services provided to Client 1 for the period from April 7, 2024 to April 13, 2024 and was paid $1,981.32 for these services.[11] MaineCare claims records further reflect that Community submitted a claim for 17 units (255 minutes) of respite care services provided to Client 1 during the period from April 12, 2024 to April 13, 2024, and was paid $142.12 for these services.

65. EVV records from April 7, 2024, through April 13, 2024, reflect that the device used to enter EVV data for Al Rashid's purported visits to Client 1 was located at or near Client 1's residence at the time entries were made. However, remote video surveillance from April 7, 2024, through April 13, 2024, showed that Al Rashid was at his own residence during certain periods in which EVV records purported to show that he provided service to Client 1 at her residence. Further details regarding remote video surveillance are summarized below: [12]

a. **April 7, 2024:** The remote surveillance camera was out of focus.
b. **April 8, 2024:** At 7:28 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive and a male individual who appeared to be Al Rashid exited the vehicle and walked toward the residence. At 9:28 p.m. the white Honda Pilot left the residence. At 10:00 p.m., an individual drove away in the white Honda Ridgeline.

---

[11] EVV records indicate that another worker, Mohammed Alkhalaf, provided an additional 1334 minutes of personal support services to Client 1 between April 7, 2024, and April 13, 2024. MaineCare claims for personal support services and respite care services do not identify the worker or workers who provided the services.

[12] Vehicle registrations were not legible in surveillance recordings summarized in this affidavit. In addition, darkness or camera focus issues obscured the physical appearance of individuals during certain periods of the surveillance footage. Accordingly, I have noted instances where surveillance footage was of sufficient quality to determine the individual shown appeared or did not appear to be Al Rashid. These determinations were made based on whether the individual depicted in the surveillance footage matched or did not match Al Rashid's general physical characteristics, as surveillance footage was not typically of sufficient quality to make a full facial identification.

c. **April 9, 2024:** At 7:41 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive, and a male individual who appeared to be Al Rashid exited the vehicle and walked toward residence. No one appeared to leave the residence for the rest of the night.

d. **April 10, 2024:** At 6:54 p.m., a male individual who appeared to be Al Rashid walked away from the residence, entered the white Honda Ridgeline and drove away. At 7:40 p.m., the white Honda Ridgeline returned to residence after which an individual exited the vehicle and walked toward the residence. At 8:47 p.m., an individual walked away from the residence and drove away in the white Honda Ridgeline. At 10:25 p.m., the white Honda Ridgeline returned to the residence, after which an individual left the vehicle and walked toward the residence.

e. **April 11, 2024:** At 5:51 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive, and a male individual who appeared to be Al Rashid exited the vehicle and walked toward the residence. At 6:04 p.m., two male individuals arrived in a white SUV and walked toward the residence. They walked from the direction of the residence and drove away in the white SUV at 6:54 p.m. At 7:49 p.m., what appeared to be two adults and one child walked from the direction of the residence, entered the white Honda Ridgeline and drove away. At 11:54 p.m. the white Honda Ridgeline returned to the residence and what appeared to be the same two adults and one child exited the vehicle and walked toward the residence.

f. **April 12, 2024:** At 4:47 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive, and a male individual who appeared to be Al Rashid exited

the vehicle and walked toward the residence. The white Honda Ridgeline did not leave the residence for the rest of the night. Between 7:00 p.m. and 11:29 p.m. multiple other vehicles and persons arrived at the residence. Persons from these vehicles were observed approaching the residence and ultimately leaving the residence and driving away. It could not be determined from the surveillance whether Al Rashid left in one of the other vehicles.

g. **April 13, 2024:** At 4:52 p.m., an individual who appeared to be Al Rashid, along with an adult woman and a child walked from the direction of 45 Cushnoc Drive, entered the white Honda Ridgeline and drove away. At 11:59 p.m., the white Honda Ridgeline returned to the residence, and multiple people exited the vehicle and walked toward the residence.

66. There were no EVV entries for services provided by Al Rashid from April 14, 2024, through May 18, 2024. EVV entries resumed on May 19, 2024. A review of EVV entries and remote video surveillance recordings from May 19, 2024, through June 1, 2024 revealed a pattern of activity similar to that observed during April 2024: Al Rashid was again at his residence during significant periods where EVV records purported to show that he was present at Client 1's residence providing personal care or respite care services.

***March 9, 2025, to March 15, 2025***

67. As noted above, a second pole camera was placed outside Client 1's residence on or about March 4, 2025. Analysts reviewing remote surveillance footage and EVV data observed that Al Rashid rarely visited Client 1's residence and that visits were brief, despite continued EVV entries (including corresponding GPS locations for

those entries) purporting to show that Al Rashid provided personal care and respite care services at Client 1's residence.

68. The following chart shows Al Rashid's EVV entries when he was purportedly providing services to Client 1 at her residence during the period from March 9, 2025, to March 15, 2025.

| SERVICE | EMPLOYEE | IN CALL | OUT CALL | BILL TIME (Minutes) |
|---|---|---|---|---|
| T1019 | Al Rashid, Adel | 3/9/2025 5:57:51 PM | 3/9/2025 11:15:27 PM | 318 |
| T1019 | Al Rashid, Adel | 3/10/2025 5:57:42 PM | 3/10/2025 11:16:08 PM | 319 |
| T1019 | Al Rashid, Adel | 3/11/2025 5:58:33 PM | 3/11/2025 11:15:43 PM | 317 |
| T1019 | Al Rashid, Adel | 3/12/2025 5:58:00 PM | 3/12/2025 11:02:28 PM | 304 |
| T1019 | Al Rashid, Adel | 3/13/2025 5:59:13 PM | 3/13/2025 11:02:31 PM | 303 |
| T1005 | Al Rashid, Adel | 3/14/2025 4:27:27 PM | 3/14/2025 6:30:59 PM | 123 |
| T1019 | Al Rashid, Adel | 3/14/2025 6:31:26 PM | 3/14/2025 11:35:25 PM | 304 |
| T1005 | Al Rashid, Adel | 3/15/2025 3:57:42 PM | 3/15/2025 6:14:29 PM | 137 |
| T1019 | Al Rashid, Adel | 3/15/2025 6:14:57 PM | 3/15/2025 11:35:26 PM | 321 |
| Total Bill Time (Al Rashid) | | | | 2446 |

69. MaineCare claims records reflect that Community submitted a claim for for 237 units (3,555 minutes) of personal support services provided to Client 1 for the period from March 9, 2025 to March 15, 2025, and was paid $1,981.32 for these services.[13] MaineCare claims records further reflect that Community submitted a claim

[13] EVV records indicate that another worker, Mohammed Alkhalaf, provided an additional 1448 minutes of personal support services to Client 1 between March 9, 2025, through March 15, 2025. MaineCare claims for personal support services and respite care services do not identify the worker or workers who provided the services.

for 17 units (255 minutes) of respite care services provided to Client 1 during the period from April 12, 2024 to April 13, 2024, and was paid $142.12 for these services.

70. EVV records from April 7, 2024, through April 13, 2024 reflect that the device used to enter EVV data for Al Rashid's purported visits to Client 1 was located at or near Client 1's residence at the time entries were made. However, a review of remote video surveillance from March 9, 2025, through March 15, 2025 showed that Al Rashid was not at Client 1's residence during periods which EVV records purported to show that he provided service to Client 1 at her residence. Further details regarding remote video surveillance are summarized below:

e. **March 9, 2025:** At 6:34 p.m., a male individual who did not appear to be Al Rashid exited and entered Client 1's residence multiple times and moved a gray van and a gray SUV that were parked outside Client 1's residence. The male subsequently reentered the residence. At 7:28 p.m., two individuals left Client 1's residence and walked away. At 8:46 p.m. two individuals approached on foot and entered Client 1's residence. Neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

f. **March 10, 2025:** At 3:47 p.m., a white Honda Ridgeline arrived and parked outside Client 1's residence. A male individual who appeared to be Al Rashid exited the white Honda Ridgeline and entered Client 1's residence. At 4:37 p.m., the male individual who appeared to be Al Rashid left Client 1's residence and drove away in the white Honda Ridgeline and did not appear to return for the rest of the night. Except as previously described, neither Al Rashid nor his vehicles appeared to visit Client 1's

residence during the period in which EVV records indicated he was providing her with services.

g. **March 11, 2025:** At 5:23 p.m., two women arrived at Client 1's residence in a gray SUV, exited the vehicle, then entered the residence. At 5:44 p.m., a male individual and two female individuals arrived at Client 1's residence in a gray van, exited the vehicle, then entered the residence. At 5:48 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive. A male individual who appeared to be Al Rashid exited the white Honda Ridgeline and entered 45 Cushnoc Drive. At 6:54 pm, a male and female exited 45 Cushnoc Drive in what appears to be religious dress and left the residence in a white Honda Pilot. At 10:20 pm, what appears to be a white SUV arrived at 45 Cushnoc Drive (visibility is low after dark and camera is blurry). Neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

h. **March 12, 2025:** At 6:24 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive and a male who appeared to be Al Rashid exited the vehicle and entered the residence. At 9:06 p.m., the white Honda Ridgeline drove away from 45 Cushnoc Drive and returned to 45 Cushnoc Drive at 10:47 p.m. Neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

i. **March 13, 2025:** At 5:35 p.m., a gray van arrived at Client 1's residence. A man who did not appear to be Al Rashid, and a woman, exited the gray

van and entered Client 1's residence. At 6:40 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive. A male individual who appeared to be Al Rashid exited the vehicle and entered 45 Cushnoc Drive. At 7:29 pm, a male exited 27 Brooklawn Ave and left the residence in the same van as noted at 5:35 pm. At 7:47 pm, a similar appearing van arrived at 27 Brooklawn Ave and an adult male and an adult female exited the vehicle and went inside the residence.[14] At 9:27 p.m., an individual exited 45 Cushnoc Drive and drove away in the white Honda Ridgeline. At 9:40 p.m., the white Honda Ridgeline arrived at Client 1's residence, and an adult male individual exited the vehicle and approached the front door of Client 1's residence. The front door opened, and the male individual appeared to have a brief conversation with someone inside Client 1's residence. The male individual departed and drove away in the white Honda Ridgeline at 9:42 p.m. At 11:40 p.m., the white Honda Ridgeline returned to 45 Cushnoc Drive and an individual exited the vehicle and entered 45 Cushnoc Drive. Except as previously described, neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

j. **March 14, 2025:** At 3:47 pm, a gray van arrived at Client 1's residence. A man who did not appear to be Al Rashid exited the vehicle and entered Client 1's residence. At 5:26 p.m., the man left Client 1's residence and drove away in the gray van. At 5:52, the gray van returned to Client 1's

[14] Due to darkness, the color of the van could not be determined.

residence and the same man exited the van and entered Client 1's residence. At 6:05 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive and an individual exited the vehicle and entered the residence. The white Honda Ridgeline did not appear to leave the residence for the rest of the night. At 8:20 p.m., a man and woman left Client 1's residence, entered the gray van, and drove away. What appeared to be the same van returned to Client 1's residence at 10:28 p.m., and the man and woman exited the vehicle and entered Client 1's residence. Neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

k. **March 15, 2025:** At 4:46 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive and a man who appeared to be Al Rashid, and a woman, exited the vehicle and unloaded several items. The man then reentered the white Honda Ridgeline and drove away. At 6:13 p.m., two people who did not appear to be Al Rashid arrived at Client 1's residence on foot and entered the residence. At 7:18 p.m., the white Honda Ridgeline arrived at 45 Cushnoc Drive, and one person left the vehicle and entered the residence. At 8:59 pm, two people appeared in the driveway at 45 Cushnoc Drive and appeared to load something into the white Honda Ridgeline truck bed and depart the residence. At 9:43 p.m., the White Honda Ridgeline arrived at Client 1's residence. Two individuals, one appearing to be a man and the other a woman, exited the white Honda Ridgeline and removed items from the truck bed. The woman approached the door to Client 1's residence and appeared to leave items at the residence, while the

man reentered the white Honda Ridgeline. The woman got back into the white Honda Ridgeline, which then drove away at approximately 9:45 p.m. What appeared to be the white Honda Ridgeline returned to 45 Cushnoc Drive at 10:56p.m. Except as previously described, neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

***June 29, 2025, through July 5, 2025***

71. Remote surveillance footage from June and July 2025 showed that Al Rashid rarely visited Client 1's residence and that when he did, visits were brief, despite EVV entries purporting to show that Al Rashid provided personal care and respite services at Client 1's residence.

72. The following chart shows Al Rashid's EVV entries when he was purportedly providing services to Client 1 at her residence during the period from June 29, 2025, through July 5, 2025.

| SERVICE | EMPLOYEE | IN CALL | OUT CALL | BILL TIME (Minutes) |
|---|---|---|---|---|
| T1019 | Al Rashid, Adel | 6/29/2025 5:58:57 PM | 6/29/2025 11:15:29 PM | 317 |
| T1019 | Al Rashid, Adel | 6/30/2025 5:59:09 PM | 6/30/2025 11:15:28 PM | 316 |
| T1019 | Al Rashid, Adel | 7/2/2025 5:58:33 PM | 7/2/2025 11:03:03 PM | 305 |
| Total Bill Time (Al Rashid) | | | | 938 |

73. MaineCare claims records reflect that Community submitted a claim for for 237 units (3,555 minutes) of personal support services provided to Client 1 for the period from June 29, 2025 to July 5, 2025, and was paid $1,981.32 for these services.[15]

[15] EVV records indicate that two other workers provided personal support services to Client 1 from June

MaineCare claims records further reflect that Community submitted a claim for 17 units (255 minutes) of respite care services provided to Client 1 during the period from June 29, 2025 to July 5, 2025, and was paid $142.12 for these services.

74. EVV records from June 29, 2025, to July 5, 2025 reflect that the device used to enter EVV data for Al Rashid's purported visits to Client 1 was located at or near Client 1's residence at the time entries were made. However, a review of remote video surveillance from June 29, 2025, to July 5, 2025 showed that Al Rashid was not at Client 1's residence during periods which EVV records purported to show that he provided service to Client 1 at her residence. Further details regarding remote video surveillance are summarized below:

a. **June 29, 2025:** Between 2:30 p.m. and 7:00 p.m., multiple people were observed in front of Client 1's residence and arriving and leaving in vehicles which included a gray van and a gray hatchback. At 5:57 p.m., a man who appeared to be Al Rashid left 45 Cushnoc Drive and drove away in a gray pickup truck.[16] The man returned to 45 Cushnoc Drive in the gray pickup truck at 7:08 p.m., and left again in the gray pickup at 8:01 p.m. At 7:26 pm, a gray SUV arrived at 27 Brooklawn Ave and what appeared to be two women exited the vehicle and went inside the residence. The pickup returned to 45 Cushnoc Drive at 11:24 p.m. Similarly, the woman in the white Honda Pilot was observed coming and

29, 2025, to July 3, 2025. Specifically, the records indicate that Mohammed Alkhalaf, provided 1448 minutes of personal support services to Client 1, and Al Rashid's wife Sura Al Mohammed provided 1489 minutes of personal support services and 259 minutes of respite care services to Client 1 during that period.

[16] Maine BMV records indicate that a Gray Dodge Ram, ME License No. 497KAV was registered to Al Rashid on September 1, 2025.

going from the 45 Cushnoc Drive before finally returning at 9:08 p.m. Neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

b. **June 30, 2025:** From approximately 6:00 p.m. to 8:00 p.m., multiple persons, none of whom appeared to be Al Rashid, were observed in the driveway at Client 1's residence. At approximately 7:18 p.m., an individual left 45 Cushnoc Drive in the gray pickup truck, then returned at 8:06 p.m. At approximately 7:23 pm, an individual left 45 Cushnoc Drive in the white Honda Pilot and returned at 9:33 pm. The gray pickup left 45 Cushnoc Drive at 8:17 p.m., and appeared to return at 11:34 p.m. Neither Al Rashid nor his vehicles appeared to visit Client 1's residence during the period in which EVV records indicated he was providing her with services.

c. **July 1, 2025:** There were no EVV entries for Al Rashid.

d. **July 2, 2025:** At 9:51 a.m., a man who appeared to be Al Rashid left 45 Cushnoc Drive and drove away in a white Honda Civic. At 6:14 p.m., the white Honda Civic returned to 45 Cushnoc Drive and what appeared to be the same man entered the residence. At the same time, a box truck arrived at 45 Cushnoc Drive and the driver appeared to unload several large items/furniture into the garage, then left at 6:43 p.m. The box truck driver did not appear to be Al Rashid. At 7:31 p.m., a woman left 45 Cushnoc Drive and drove away in the white Honda Pilot. At 9:11 pm, a van arrived at 27 Brooklawn Ave and three people exited the van and entered the residence. Neither Al Rashid nor his vehicles appeared to visit Client 1's

residence during the period in which EVV records indicated he was providing her with services.

e. **July 3, 2025:** There were no EVV entries for Al Rashid.

f. **July 4, 2025:** There were no EVV entries for Al Rashid.

g. **July 5, 2025:** There were no EVV entries for Al Rashid.

75. EVV records for Client 1 indicate that there were no further entries purporting that services were provided by Al Rashid after August 3, 2025. However, EVV records indicate that Client 1 continued to receive personal support services from Community employees Sura Al Mohammed (Al Rashid's wife) and Mohammed Alkhalaf (Alkhalaf), through early March 2026. Analysts are continuing to review remote surveillance footage to determine whether Al Mohammed and Alkhalaf were present during periods which EVV entries indicated that they were providing service to Client 1 at her residence.

76. As noted herein, EVV records purported to show that other workers provided additional personal support services to Client 1 during the above-referenced periods: April 7, 2024, to April 13, 2024; March 9, 2025, to March 15, 2025; and June 29, 2025, to July 5, 2025. However, the total units of personal support services claimed by Community with respect to Client 1 during these periods indicate that services purportedly provided by Al Rashid were included in the claims. In addition, EVV entries purported to show that only Al Rashid provided respite care services to Client 1 during the periods from April 7, 2024, to April 13, 2024, and from March 9, 2025, to March 15, 2025. Accordingly, I believe that Community submitted claims to MaineCare and received payments for personal support and respite care services that were not actually provided by Al Rashid.

77. As detailed above, PSS workers utilize mobile devices such as cellular phones to access the Sandata EVV system to log visit times with clients and may use such devices to log visit times via Sandata TVV. Based on my training and experience, mobile phones such as the Device typically contain data regarding the physical location of the device at various points in time. Further, an individual's communications are often relevant to determine where they were and what they were doing at a particular time. In addition, Al Rashid's Sandata EVV profile lists his email address as bigadel2005@yahoo.com and his cell phone number as (207) 420-5687 and does not list any other contact information that could have been used to communicate with clients or other employees of Community. Accordingly, there is reason to believe that stored communications, records, and other data saved on the Subject Device will provide evidence of the offenses under investigation.

***Al Rashid and Decent***

78. During the investigation into Al Rashid, I learned that two clients of Decent, other than Client 1, also reside at 27 Brooklawn Avenue, Augusta, Maine. One of these individuals has received personal support services from employees of Decent from approximately October 2024 through January 2026. The other individual has received personal support services from employees of Decent from approximately September 2025 through January 2026. Analysts are continuing to review remote surveillance footage to determine whether the Decent employees were present during periods which EVV entries indicated that they were providing services to the clients who reside at 27 Brooklawn Avenue, Augusta, Maine. EVV records indicate that entries for the two Decent clients were input into the EVV system manually rather than through the mobile application. Accordingly, there is no location information associated with the entries.

79. Additionally, on multiple occasions law enforcement observed Al Rashid entering Decent's offices at 179 Mount Vernon Avenue, Ste. 5, Augusta, Maine.

***State Investigation and Seizure of the Subject Device***

80. In October 2025, Augusta Police Department personnel investigated a report that certain Child Sexual Abuse Material (CSAM) originated from Al Rashid's SnapChat account username "bigadel20051". This investigation is set forth in further detail in my affidavit dated January 9, 2026, submitted in support of a search warrant for the SnapChat Account associated with username "bigadel20051", which is attached hereto and incorporated herein as Exhibit 4. See *In the Matter of the Search of Information Associated with the SnapChat Account BigAdel20051 Stored at Premises Controlled by Snap Inc.* Case No. 2:26-mj-00007-KFW. As detailed in that affidavit, on October 29, 2025, an Augusta, Maine Police Detective called (207) 420-5687, and spoke with a male individual who identified himself as Adel Al Rashid and confirmed that he was the user of the phone. During the call, Al Rashid also confirmed that he lived at 45 Cushnoc Drive, Augusta, Maine.

81. On November 12, 2025, Maine District Court Judge Amy Dietrich issued a search warrant authorizing the search of 45 Cushnoc Drive, Augusta, Maine. Augusta Police executed the state search warrant at 45 Cushnoc Drive on November 13, 2025, at which time the Device was seized. The search, and the surrounding circumstances, are further detailed in Exhibit 4. Augusta Police transferred custody of the device to the Maine State Police, where it is awaiting analysis pursuant to the state search warrant.

82. I have reviewed subscriber records obtained from U.S. Cellular/T-Mobile for telephone number (207) 420-5687. These records list Adel Al Rashid, of 15 Hope Way, Unit 1, Augusta, Maine, as the "primary" contact name associated with the account

for telephone number (207) 420-5687. The email address associated with the account is listed as bigadel2005@yahoo.com.[17] Subscriber records further reveal that on November 4, 2025, the device associated with the account switched from an Apple iPhone 14 Pro to an Apple iPhone 17, which was associated with the account until November 13, 2025, the date on which the search warrant was executed at Al Rashid's residence.

83. I am aware that there are multiple methods which may be used by iPhone users to transfer data stored in one iPhone to another iPhone, including when users upgrade to a new iPhone. Such data transfers can be accomplished by downloading an iCloud backup file stored in Apple iCloud, or by transferring data directly from the old device to the new device, either wirelessly or using a wired connection.[18] Accordingly, I believe that although Al Rashid acquired the Device on November 4, 2025, it is likely that the Device will contain data from prior to November 13, 2025.

84. The Device is currently in storage at the Maine State Police Digital Forensics Lab located at 15 Oak Grove Road, Vassalboro, ME 04989. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Augusta Police Department.

## **TECHNICAL TERMS**

85. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data

[17] Al Rashid's EVV account profile lists the same email address: "bigadel2005@yahoo.com."
[18] See, *Use Quick Start to transfer data to a new iPhone or iPad*, https://support.apple.com/en-us/102659 [Last visited February 27, 2026].

communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communication, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or “MP3 Player” or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated “GPS”) consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna’s latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static, that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

86. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

87. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

88. There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained

in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

89. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).
b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.
c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.
d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

90. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection to determine whether it is evidence described by the warrant.

91. *Manner of Execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

92. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Craig S. Mehrmann
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Mar 27 2026

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title