# EXHIBIT 4

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Maine

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
INFORMATION ASSOCIATED WITH THE SNAPCHAT ACCOUNT BIGADEL20051, STORED AT PREMISES CONTROLLED BY SNAP INC.

Case No. 2:26-mj-00007-KFW

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See attachment A.

located in the ________________ District of ______Maine______, there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 2251(a); 2252A (a)(2); 2252A(a)(3)(b); 2252A (a)(5)(b); 2252A(b)(1) and (2) | Production of Child Pornography; Receipt or Distribution of Child Pornography; Solicitation of Child Pornography; Possession of Child Pornography; Attempt |

The application is based on these facts:

See attached affidavit of Special Agent Craig Mehrmann.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Craig Mehrmann

*Printed name and title*

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Jan 09 2026

*Judge's signature*

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge

*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following accounts that are stored at premises owned, maintained, controlled, or operated by Snap Inc., a company headquartered at 2772 Donald Douglas Loop North Santa Monica, CA 90405A:

Snapchat account identified by the username of bigadel20051 which was active on dates including July 31, 2025, and August 1, 2025

## ATTACHMENT B

## Particular Things to be Seized

### I. Information to be disclosed by Snap Inc. ("Snap")

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Snap, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or around November 19, 2025, Snap is required to disclose the following information to the government for each account or identifier listed in Attachment A (the "**Account**"):

a. all records or other information pertaining to the **Account**, including all files, databases, and database records stored by Snap in relation to those accounts, from July 17, 2025 to August 14, 2025;

b. all information in the possession of Snap that might identify the subscribers related to this account or identifiers, including names, dates of birth, addresses, telephone numbers, email addresses, account creation date, the length of service (including start date), types of services utilized, timestamps and IP address for account logins/logouts, and means and source of payment for services (including any credit card or bank account number);

c. all usage information for the **Account**, including search queries submitted and information about how the user of the **Account** communicates with other users, from July 17, 2025 to August 14, 2025;

d. logs, including sender, recipient, date, time, message type, message status (including if and when the message was opened), and whether the receiver used the

native screen capture function of their device, concerning communications, including Snaps, Stories, Chats, or Memories sent to or from the **Account**, and log information when the user of the **Account** uses Snap's website, including device information, access times, pages viewed, IP address, and pages visited, from July 17, 2025 to August 14, 2025;

e. all information about which users of **Account** communicate with the most, from July 17, 2025 to August 14, 2025;

f. device information such as the device memory, advertising identifiers, unique application identifiers, apps installed, version numbers of the Snapchat app installed and date of each installation, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength of devices used by the **Account** in conjunction with the service, from July 17, 2025 to August 14, 2025;

g. information obtained from the devices used by the **Account**, including the device's phonebook, cameras, and photos, from July 17, 2025 to August 14, 2025;

h. location information about **Account**, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses, as well as location information obtained using the Snap Map feature, from July 17, 2025 to August 14, 2025;

i. receipts for any transactions conducted by **Account,** from July 17, 2025 to August 14, 2025;

j. list of all "friends" of the users of the **Account**, changes to these lists, and dates of any changes, from July 17, 2025 to August 14, 2025;

k. all users listed in the "Quick Add" feature for the users of the **Account**;

l. all information and records relating to "friend suggestions" made to the users of the **Account,** from July 17, 2025 to August 14, 2025; and

m. content of all communications, including Snaps, Memories, Stories, or Chats, sent or received by **Account,** from July 17, 2025 to August 14, 2025.

Snap is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (Production of Child Pornography), 18 U.S.C. §§ 2252A(a)(2) (Receipt or Distribution of Child Pornography), 18 U.S.C. §§ 2252A(a)(3)(b) (Solicitation of Child Pornography), 18 U.S.C. §§ 2252A(a)(5)(b) (Possession of Child Pornography), as well as 18 U.S.C. §§ 2252A(b)(1) and 2252A(b)(2) (Attempt), those violations involving Adel Al Rashid, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Images of child pornography and files containing images of child pornography;

(b) Information, correspondence, communications, and other materials constituting evidence of, or pertaining to, the sexual exploitation of minors;

(c) Any and all records, documents, messages, telephone numbers, text messages, correspondence, communications, images, internet search history, or other information, which evince a sexual interest in minors or child exploitation;

(d) Records and information relating to the existence of internet sites, social media applications, file sharing applications, or chat applications, related to child pornography or a sexual interest in children;

(e) Evidence indicating how and when the accounts were accessed or used, to determine the geographic and chronological context of account access,

use, and events relating to the crime under investigation and to the owner of the accounts;

(f) Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

(g) The identity of the person(s) who created or used the user IDs, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Craig S. Mehrmann, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since February 2023. I am currently assigned to the Boston Division, Portland, Maine Resident Agency on the FBI Maine Safe Streets Task Force. As part of my duties, I investigate crimes involving violent crimes against children. I have received formal and on-the-job training in the investigation of cases involving these crimes and have investigated such crimes prior.

2. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Snap Inc. ("Snap"), an electronic communications service and/or remote computing service provider headquartered at 2772 Donald Douglas Loop North Santa Monica, CA 90405. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3. The facts in this affidavit come from my personal observations, training, and experience, and information obtained from other law enforcement (LE) officers and

witnesses. This affidavit is intended to provide only the facts necessary for a determination of probable cause for the requested search warrant. I have not included every fact known to me.

4. This affidavit is made in support of an application for a search warrant for information stored on a Snapchat account with username "bigadel20051" (Hereinafter referred to as the SNAPCHAT ACCOUNT).

5. Specifically, this application is seeking a warrant to search information regarding the digital data located on the SNAPCHAT ACCOUNT as further described in Attachment A.

6. As set forth in more detail below, I respectfully submit that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (Production of Child Pornography), 18 U.S.C. §§ 2252A(a)(2) (Receipt or Distribution of Child Pornography), 18 U.S.C. §§ 2252A(a)(3)(b) (Solicitation of Child Pornography), 18 U.S.C. §§ 2252A(a)(5)(b) (Possession of Child Pornography), as well as 18 U.S.C. §§ 2252A(b)(1) and 2252A(b)(2) (Attempt), (Collectively referred to as the "TARGET OFFENSES") is located within the SNAPCHAT ACCOUNT.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**ABOUT THE NATIONAL CENTER FOR MISSING AND EXPLOITED CHILDREN**

8. The National Center for Missing and Exploited Children (NCMEC) is a nonprofit organization that provides services to families and professionals that relate to the abduction and sexual exploitation of children. NCMEC also operates the CyberTipline and the Child Victim Identification Programs (CVIP) to assist law enforcement officers and others in identifying and rescuing victims of child exploitation and child sexual abuse material (CSAM). As part of the NCMEC directives, NCMEC works with electronic service providers (ESPs) and remote computing service providers, such as Google, to reduce the dissemination of CSAM images and/or videos on the internet.

9. When an ESP becomes aware of suspected CSAM images and/or videos, the ESP representative may view the images and/or videos in question to determine if the images and/or videos are CSAM and thus a violation of the ESP's use agreement with the user(s). If the image and or video is deemed by the ESP representative to be CSAM, the ESP will file an electronic report with the NCMEC. The reporting ESP will provide in the NCMEC report samples of the CSAM images and/or videos, IP addresses captured at the date and time of the CSAM file being uploaded by the user, and any registration information (if available). NCMEC will then research more publicly available information based on the information provided to them by the ESP to determine, if possible, the identification and/or geographic location of the user uploading the child pornography images and/or videos to forward the report to the appropriate jurisdiction. NCMEC will then forward their report to the Regional Internet

Crimes Against Children (ICAC) Commander for further investigation. The Maine Computer Crimes Unit (CCU) is the Regional ICAC for Maine.

**PROBABLE CAUSE**

10. On August 1, 2025, NCMEC received a CyberTip regarding apparent CSAM. The NCMEC CyberTip report number is 217257667 and was submitted by Electronic Service Provider (ESP) Snapchat in accordance with federal law, 18 U.S.C.A. § 2258A. NCMEC reviewed the files submitted by Snapchat in their entirety before forwarding the CyberTip to MSP CCU. Snapchat identified an account with username "bigadel20051" to be associated with apparent CSAM. The Snapchat account was registered with Yahoo email address bigadel2005@yahoo.com and phone number (207) 420-5687. Snapchat indicated this account was used to upload one (1) file of apparent CSAM on July 31, 2025 at 12:13:19 UTC. Further, the CyberTip indicated that IP address 64:222.238.231 was associated with username bigadel20051 on August 1, 2025 at 4:42:34 UTC.[1]

11. Augusta, Maine Police Department (APD) is an affiliate of the MSP CCU. A Detective at APD was assigned to investigate this CyberTip. An APD detective received a copy of the apparent CSAM associated with the CyberTip and confirmed the video appeared to be CSAM. The video shows a young female, who appears to be prepubescent, lying on her back with her vagina exposed. The evidence that the child is prepubescent is that she does not have any signs of pubic hair growth as well as the size of her body being small and childlike. Based on the Detective's training, education, and

[1] The CyberTip indicated that the IP address data "may be associated with one of several sources, including logout or app authentication events."

experience, he determined the child is under the age of 10 years old. In the video there is an adult performing oral sex on the child. I have reviewed the video file previously reviewed by the APD Detective and agree with his conclusions. The video has a hash value of "0d7ad586f3bfc33a65714d23725b9b0a". The file name in the NCMEC report is listed as "bigadel20051-null-aa14c9b1-3bcd-5dff-bfbc-ab2c7890837b~21067-bc80212f60-content.mp4". Still images from this video are marked as Exhibit 1 and submitted herewith under seal.

12. The APD Detective was advised by NCMEC Technical Support that the child had not yet been identified, and that the video has been circulating since 2016.

13. On October 29, 2025, the APD Detective called telephone number (207) 420-5687 and engaged in a conversation with a male individual who answered the call. The male individual identified himself as Adel Al Rashid and confirmed that he was the user of the phone. Al Rashid also advised that no one else uses his phone. Al Rashid confirmed that he lived at 45 Cushnoc Drive, Augusta, Maine. During this conversation, the Detective did not inform Al Rashid about the investigation.

14. On November 12, 2025, Maine District Court Judge Amy Dietrich issued a search warrant authorizing the search of 45 Cushnoc Drive, Augusta, Maine. A copy of the search warrant and affidavit submitted in support thereof is attached hereto as Exhibit 2. On November 13, 2025, APD executed the state search warrant at 45 Cushnoc Drive, Augusta, Maine. Present at the residence at the time of the search warrant execution were Al Rashid along with Sura Al Mohammed and Ayman Al Rashid. The residence was secured for safety, and all parties were informed of the reason for the search warrant. Al Rashid was provided with a copy of the state search warrant. After confirming he did not have any electronics on his person, Al Rashid was advised that he

was not under arrest or detained and was free to go. The APD Detective further explained that he would like to speak to Al Rashid, but he was not required to do so. Al Rashid stated he understood and wanted to speak with APD about the case. During the initial part of the interview, Al Rashid stated his Snapchat account was hacked a few months ago, sometime in September or October. [NOTE: The NCMEC report was generated on September 22, 2025.] The APD Detective confirmed with Al Rashid that when Al Rashid used the term hacked, he meant his account shut down, and that he could no longer access the account from that time onward. Al Rashid went on to explain that he does not use the account much, but when he tried and log in, it would not let him. He stated that "it said sexual abuse or something like that." The APD Detective confirmed with Al Rashid that he received a message that said something about sexual abuse. The APD Detective spoke with Al Rashid about the video described above, and whether Al Rashid remembered getting a video of a child and it being of a sexual nature. Al Rashid stated "no". The APD Detective then showed Al Rashid a screen shot image of the video described above and asked him if he remembered the video and he stated "no".

15. The APD Detective asked what electronics Al Rashid had in the house, and Al Rashid stated he had a phone and an Apple watch. He further stated there was a computer which everyone in the home uses. The APD Detective asked how long he has had his current phone, and Al Rashid said he got a new phone a few weeks ago because the old one wasn't charging and was broken. Al Rashid further advised that he has a new Snapchat account on the new phone. The APD Detective confirmed with Al Rashid that his Snapchat email was bigadel2005@yahoo.com and the phone number associated with the Snapchat account is his current number, (207) 420-5687.

16. I have reviewed subscriber records obtained from U.S. Cellular/T-Mobile for telephone number (207) 420-5687. These records list Adel Al Rashid, of 15 Hope Way, Unit 1, Augusta, Maine, as the "primary" contact name associated with the account for telephone number (207) 420-5687.[2] The email address associated with the account is listed as bigadel2005@yahoo.com. Subscriber records further reveal that on November 4, 2025, the device associated with the account switched from an Apple iPhone 14 Pro to an Apple iPhone 17, which was associated with the account until November 13, 2025, the date on which the search warrant was executed at Al Rashid's residence.

17. I have reviewed information obtained from Consolidated Communications in response to a Grand Jury subpoena for subscriber information associated with IP address 64.222.238.231 on 8/1/2025 04:42:34 UTC. The information provided by Consolidated communications revealed that the subscriber associated with the IP address was Sura Al-Mohammed, with a service address of 45 Cushnoc Drive, Augusta, Maine, telephone number (207) 420-5687.

18. I have obtained information from United States Customs and Border Patrol related to a 2012 visa application submitted by Al Rashid. In these records, Al Rashid's spouse was identified as Sura Abdalmuhsen Abdalhusen Al Mohammed.

19. On November 19, 2025, the United States Attorney's Office sent a letter to Snap requesting that all records, communications, and other evidence for the account

[2] The records also indicate that "Mohammed Khadim," of 15 Hope Way, Unit 1, Augusta, Maine, is an "authorized" contact associated with the account.

associated with bigadel2005@yahoo.com or 207-420-5687 be preserved for a period of 90 days.

20. Based on the above facts, I believe there is probable cause to search the contents of the SNAPCHAT ACCOUNT for evidence, contraband, fruits, and instrumentalities of the TARGET OFFENSES.

**RELEVANT INFORMATION REGARDING PERSONS INVOLVED IN THE PRODUCTION, DISTRIBUTION, AND POSSESSION OF CHILD PORNOGRAPHY AND ONLINE CHILD ENTICEMENT**

21. As set forth above, there is probable cause to believe that the Snapchat Account has been used to distribute, transport, receive, and possess child pornography. Additionally, there is probable cause that evidence relevant to this ongoing investigation will be found within data associated with the Snapchat Account. Based upon my training and experience in child sexual exploitation and CSAM investigations as well as through conversations with other officers with knowledge and experience with these types of investigations, I know the following:

a. Those who have possessed and/or disseminated CSAM or child sexual exploitation material and/or disseminated obscene material to purported minors have an interest or preference in the sexual activity of children. Persons who are involved with CSAM generally have other sexually explicit materials on additional accounts and/or other digital media devices related to their interest in children, which may consist of photographs, motion pictures, videos, books, slides, text material, computer graphics and digital or other images/visual material for their own sexual gratification. This often includes what may be termed as child erotica or child exploitation material, which may consist of images or videos such as

minors in lingerie or text writing involving sex with minors that do not rise to the level of CSAM, but nonetheless fuel their deviant sexual fantasies involving minors. I am aware that this sort of material has been admitted in trials under Fed.R.Evid. 404(b) to prove such things as the possessor's knowledge, intent, motive, and identity to prove the person has a sexual interest in minors. I understand that they may upload or import (meaning transfer) this illicit imagery, including CSAM, onto multiple digital media devices and/or accounts so they can access such material readily to satisfy their prurient desires.

b. Individuals who collect CSAM often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of CSAM and child erotica. They do this to gain status, trust, acceptance, and support and to increase their collection of CSAM and child erotica. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, peer-to-peer (P2P) chat and file sharing programs, e-mail, e-mail groups, bulletin boards, Internet Relay Chat (IRC), newsgroups, Internet clubs, and various forms of Instant Messaging such as Snapchat, WhatsApp, Facebook Messenger, Yahoo Messaging, Telegram, and Kik that are sometimes saved on the users' computer or other digital storage media. They may upload files from their CSAM and child erotica collections onto multiple social media accounts where they communicate with others sharing their interests.

c. These individuals typically retain correspondence with these other like-minded individuals. They will make efforts generally to conceal such correspondence as they do with their contraband material, and they often maintain lists of names, account identifiers and other identifying information about individuals with whom they have been in contact and who share the same interests in child pornography.

d. Besides CSAM and child erotica, such individuals often produce and/or collect other written material about sexual activities with minors, which range from fantasy stories to medical, sociological, and psychological writings, which they save to understand and justify their illicit behavior and desires.

e. Individuals who collect CSAM often collect, read, copy, and/or maintain names, addresses, including e-mail addresses, phone numbers, and lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests or have CSAM and child erotica for sale or trade. These contacts are maintained for personal referral, exchange or, sometimes, commercial profit. They may maintain these names on computer storage devices, web sites or other Internet addresses. Their discovery can serve as leads to assist law enforcement in proving the instant case and in apprehending others involved in the underground trafficking of CSAM as well as identifying the origin of the images or videos to assist with locating the child victims depicted in the imagery.

f. Collectors and distributors of CSAM may also receive sexual gratification, stimulation and satisfaction from contact with children, both in person as well as online.

g. Individuals who collect CSAM often retain explicit materials for long periods and may go to great lengths to conceal and protect from discovery, theft, and damage, their collections of illicit materials. Because of their desire to retain child pornography together with the sense of security afforded by using digital media devices and accounts, the collectors will often retain these CSAM and child exploitation imagery for lengthy periods of time. These individuals usually maintain their collections of sexually explicit materials in the privacy of their own homes and possessions. These individuals may protect their illicit materials from discovery by other through use of passwords, and encryption, and other security measures, including on third party image storage sites via the Internet. They often maintain these collections for several years and keep them close by, usually at the individual's residence, to enable the collector/manufacture to view and/or access the collection, which is valued highly.

h. In some instances, these depictions are actual photographs or images of the suspect's own sexual activity with past or present child victims. This imagery serves as archives of hands-on offenses and/or CSAM that they enticed real children to produce, which tends to be extremely important to these individuals. Such individuals may keep such depictions as means of plying, broaching or titillating the sexual interests of new or prospective

child victims. They may also retain them for lengthy periods of time for their own personal arousal. These offenders are less likely to destroy CSAM or child erotica from child victims known to them. They may send such materials to others with similar deviant interests to brag about their conquests and/or view these produced materials as akin to trophies. In such a manner, hands on offenders may keep child pornography collection to fuel their interests. They may import such imagery from one device to another to keep the material readily available for their lascivious interests.

## BACKGROUND CONCERNING SNAPCHAT[3]

22. Snap, the owner of Snapchat, is a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Snapchat is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Snapchat accounts like the SNAPCHAT ACCOUNT listed in Attachment A, through which users can share messages, multimedia, and other information with other Snapchat users.

23. Snap collects basic contact and personal identifying information from users during the Snapchat registration process.

24. Snap also collects and retains information about how each user accesses and uses Snapchat. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information

[3] The information in this section is based on information published by Snap on its website, including, but not limited to, the following document and webpages: "Snap Inc. Law Enforcement Guide," available at https://www.snapchat.com/lawenforcement; and "Snapchat Support," available at https://support.snapchat.com/.

about devices and web browsers used to access an account, and session times and durations.

25. Each Snapchat account is identified by its username.

26. Snapchat offers four primary ways for users to communicate with each other.

27. **Snaps.** A user takes a photo or video using their camera phone in real-time. The user then selects a time limit of 1-10 seconds for the receiver to view the photo or video. A user can elect to have the photo/video saved in their phone's photo gallery or just sent via Snapchat, without being saved. The photo/video can then be sent to a friend in Snapchat. The snap is deleted after the selected amount of time. If a recipient attempts to take a screenshot of the snap to save on his/her phone, the application will notify the sender of this behavior.

28. Snapchat states that it deletes each snap from its servers once all recipients have viewed it. If a snap has not been viewed by all recipients, Snapchat states that it retains the snap for thirty days.

29. **Memories**. Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. A user can also edit and send Snaps and create Stories from these Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by Snapchat and may remain in Memories until deleted by the user.

30. **Stories.** A user can also add the photo/video Snap to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all Snapchatters or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

31. **Chat.** A user can also type messages to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that he or she wants to keep. The user can clear the message by tapping it again.

32. Snapchat also obtains a variety of non-content information from its users.

33. **Usage Information.** Snapchat may collect information about how users interact with its services, including which search queries they submit, and how they communicate with other users, including maintaining a log of all snaps to and from an account for the last 31 days, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient, and how a user interacts with these messages (such as when a user opens a message).

34. **Device Information.** Snapchat collects information about the devices of its users, including information about the user's hardware and software, such as the hardware model, operating system version, device memory, advertising identifiers, unique application identifiers, apps installed, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength.

35. **Device Phonebook.** Snapchat may collect information about the phonebook of the user's device.

36. **Cameras and Photos**. Snapchat may collect images and other information from the user's device's camera and photos.

37. **Location Information**. Snapchat may collect information about the user's location, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses.

38. **Snap Map**. Snapchat allows a user to share location information with his/her friends and also obtain location information about the user's friends. Based on such information, Snapchat places the friends' locations on a map viewable to the user.

39. **Information Collected by Cookies and Other Technologies**. Snapchat may collect information through cookies and other technologies about the user's activity, browser, and device.

40. **Log Information.** Snapchat collects log information when a user uses Snapchat's website, including device information, access times, pages viewed, IP address, and pages visited.

41. In my training and experience, evidence of who was using the Snapchat accounts referenced in paragraph 22 and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

42. For example, the stored communications and files connected to a Snapchat account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos,

videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

43. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Snap can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, [[email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time)]] may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45. Other information connected to the use of Snapchat account may lead to the discovery of additional evidence. For example, account activity may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity,

documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46. Therefore, Snap's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Snapchat. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

47. Based on the forgoing, I request that the Court issue the proposed search warrant.

48. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Snap. Because the warrant will be served on Snap, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

CRAIG S. MEHRMANN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: Jan 09 2026

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title

AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means ☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Maine

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
INFORMATION ASSOCIATED WITH THE SNAPCHAT ACCOUNT BIGADEL20051, STORED AT PREMISES CONTROLLED BY SNAP INC.

Case No. 2:26-mj-00007-KFW

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ________ District of Maine *(identify the person or describe the property to be searched and give its location)*:

See attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before January 23, 2026 *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Karen Frink Wolf.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of ____________.

Date and time issued: 3:01 pm, Jan 09 2026

*Judge's Signature*

City and state: Portland, Maine

Karen Frink Wolf, U.S. Magistrate Judge Judge
*Printed name and title*

UNITED STATES DISTRICT COURT DISTRICT OF MAINE

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the following accounts that are stored at premises owned, maintained, controlled, or operated by Snap Inc., a company headquartered at 2772 Donald Douglas Loop North Santa Monica, CA 90405A:

Snapchat account identified by the username of bigadel20051 which was active on dates including July 31, 2025, and August 1, 2025

# ATTACHMENT B

## Particular Things to be Seized

## I. Information to be disclosed by Snap Inc. ("Snap")

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Snap, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on or around November 19, 2025, Snap is required to disclose the following information to the government for each account or identifier listed in Attachment A (the "**Account**"):

a. all records or other information pertaining to the **Account**, including all files, databases, and database records stored by Snap in relation to those accounts, from July 17, 2025 to August 14, 2025;

b. all information in the possession of Snap that might identify the subscribers related to this account or identifiers, including names, dates of birth, addresses, telephone numbers, email addresses, account creation date, the length of service (including start date), types of services utilized, timestamps and IP address for account logins/logouts, and means and source of payment for services (including any credit card or bank account number);

c. all usage information for the **Account**, including search queries submitted and information about how the user of the **Account** communicates with other users, from July 17, 2025 to August 14, 2025;

d. logs, including sender, recipient, date, time, message type, message status (including if and when the message was opened), and whether the receiver used the

native screen capture function of their device, concerning communications, including Snaps, Stories, Chats, or Memories sent to or from the **Account**, and log information when the user of the **Account** uses Snap's website, including device information, access times, pages viewed, IP address, and pages visited, from July 17, 2025 to August 14, 2025;

e. all information about which users of **Account** communicate with the most, from July 17, 2025 to August 14, 2025;

f. device information such as the device memory, advertising identifiers, unique application identifiers, apps installed, version numbers of the Snapchat app installed and date of each installation, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength of devices used by the **Account** in conjunction with the service, from July 17, 2025 to August 14, 2025;

g. information obtained from the devices used by the **Account**, including the device's phonebook, cameras, and photos, from July 17, 2025 to August 14, 2025;

h. location information about **Account**, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses, as well as location information obtained using the Snap Map feature, from July 17, 2025 to August 14, 2025;

i. receipts for any transactions conducted by **Account,** from July 17, 2025 to August 14, 2025;

j. list of all "friends" of the users of the **Account**, changes to these lists, and dates of any changes, from July 17, 2025 to August 14, 2025;

k. all users listed in the "Quick Add" feature for the users of the **Account**;

l. all information and records relating to "friend suggestions" made to the users of the **Account,** from July 17, 2025 to August 14, 2025; and

m. content of all communications, including Snaps, Memories, Stories, or Chats, sent or received by **Account,** from July 17, 2025 to August 14, 2025.

Snap is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2251(a) (Production of Child Pornography), 18 U.S.C. §§ 2252A(a)(2) (Receipt or Distribution of Child Pornography), 18 U.S.C. §§ 2252A(a)(3)(b) (Solicitation of Child Pornography), 18 U.S.C. §§ 2252A(a)(5)(b) (Possession of Child Pornography), as well as 18 U.S.C. §§ 2252A(b)(1) and 2252A(b)(2) (Attempt), those violations involving Adel Al Rashid, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Images of child pornography and files containing images of child pornography;

(b) Information, correspondence, communications, and other materials constituting evidence of, or pertaining to, the sexual exploitation of minors;

(c) Any and all records, documents, messages, telephone numbers, text messages, correspondence, communications, images, internet search history, or other information, which evince a sexual interest in minors or child exploitation;

(d) Records and information relating to the existence of internet sites, social media applications, file sharing applications, or chat applications, related to child pornography or a sexual interest in children;

(e) Evidence indicating how and when the accounts were accessed or used, to determine the geographic and chronological context of account access,

use, and events relating to the crime under investigation and to the owner of the accounts;

(f) Evidence indicating the account owner's state of mind as it relates to the crime under investigation;

(g) The identity of the person(s) who created or used the user IDs, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# EXHIBIT 2

**STATE OF MAINE**
**KENNEBEC, ss.**

**UNIFIED CRIMINAL COURT**
**LOCATION: Augusta**
**DOCKET NO.** SW-25-157

**IN RE: SEARCH WARRANT FOR THE AUGUSTA RESIDENCE AND DIGITAL MEDIA AT 45 CUSHNOC DRIVE**

**AFFIDAVIT AND REQUEST FOR SEARCH WARRANT**
**[M.R.U. Crim. P. 41 & 41B]**

**AFFIDAVIT OF MATTHEW ESTES**
**OF THE AUGUSTA POLICE DEPARTMENT**
**IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Matthew Estes, a duly sworn law enforcement officer for the Augusta Police Department hereby state under oath and upon penalties and pains of perjury that there is probable cause to believe that:

**Part I: Located on or about the property/premises described below, namely:**

A. The premises to be searched, 45 Cushnoc Drive, is in the city of Augusta, County of KENNEBEC, Maine. The residence is a single-family residence with half brown and half blue colored wood siding and a grey shingled roof. The residence has an attached two car garage as well. The residence is approximately 50 feet off the road on the west side of Cushnoc Drive. The adjacent photograph depicting the premises was taken by Matthew Estes on October 29, 2025.



B. The premises include attics, basements, attached or detached garages, storage lockers, safes, buildings attached or unattached that are readily accessible to, under the control of, or used by the person(s) residing at 45 Cushnoc Drive, Augusta, Maine.

C. Any persons located on the premises at the time of or who arrive during the execution of the search warrant, excluding any unrelated individuals such as UPS, FedEx, etc. unless proven to be related to the investigation, including the following listed person(s):

1. Adel Al Rashid, DOB: 01/27/1979, 45 Cushnoc Drive, Augusta, Maine or wherever located in the State of Maine.

D. Any vehicles located at the residence belonging to or under the control of any residents 45 Cushnoc Drive, Augusta, Maine.

**Part II: There is certain property/evidence, namely:**

Based upon the following information, I respectfully submit that there is probable cause to believe the following item(s) themselves constitute: 1) evidence of the commission of a crime; 2) contraband, the fruits of crime, or things otherwise criminally possessed; 3) or property designed or intended for use or which is or has been used as the means of committing the offenses of possession of sexually explicit material in violation of 17-A M.R.S. § 284 and/or dissemination of sexually explicit material in violation of 17-A M.R.S. § 283, and should therefore be seized pursuant to M.R.U. Crim. P. 41 and 41B:

A. The following property to be seized from the persons, vehicles, and premises at 45 Cushnoc Drive, Augusta, Maine:

1. Images of sexually explicit conduct involving individuals under 16 years of age (commonly known as child pornography) in any form;

2. Records or images in any form pertaining to the manufacture, possession or receipt of sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography);

3. Records or images in any form relating to the identity of the individuals under 16 years of age depicted in any seized images;

4. Records or images in any form reflecting personal contact with any of the individuals under 16 years of age depicted in any seized images;

5. Records or images in any form reflecting access to, or payment for access to, websites containing or relating to sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography);

6. Computers, portable electronic devices, and digital storage media of any kind. As used both above and below, the terms "computers, portable electronic devices and digital storage media" include any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptops, tablets or notebook computers; wireless communication devices such as cellular telephones: peripheral input/output devises, routers and networking equipment and drives intended for removal media; related communications devices such as modem, cables, and connections; storage media such as hard disk drives, optical media, thumb drives, magnetic tapes, and memory chips; and security devices;

7. Camera or imaging equipment of any kind, as well as any storage medium that could be used to store images, whether digital, film or paper;

8. Records or images in any form suggesting a sexual interest in individuals under 16 years of age and their activities. These items are to include collections of photographs or magazines containing images of children and/or adolescents or child erotica;

9. Records in any form indicative of occupancy or ownership of the premises described in the search warrant (the Premises);

10. Records or images in any form that indicate ownership or use of computers, portable electronic devices, digital storage media, camera or imaging equipment found in the Premises; and

B. To further search the computers, portable electronic devices and digital storage media seized during the search of the persons, vehicles, and premises at 45 Cushnoc Drive, Augusta, Maine for the following:

1. Images of sexually explicit conduct involving individuals under 16 years of age (commonly called child pornography), in any form;

2. Evidence of use of the device to conduct Internet searches relating to sexually explicit conduct with a minor children;

3. Photographs, images, videos, and related data depicting manufacture, possession or receipt of sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography) created, accessed, read, modified, received, stored, sent, moved, deleted or otherwise manipulated;

4. Records or images in any form relating to the identity of the individuals under 16 years of age depicted in any seized images;

5. Records or images in any form reflecting personal contact with any of the individuals under 16 years of age depicted in any seized images;

6. Records or images in any form reflecting access to, or payment for access to, websites containing or relating to sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography);

7. Records or images in any form suggesting a sexual interest in individuals under 16 years of age and their activities. These items are to include collections of photographs or images containing images of children and/or adolescents and child erotica;

8. Records in any form indicative of occupancy or ownership of the premises described in the search warrant (the Premises);

9. Records or images in any form that indicate ownership or use of the computers, portable electronic devices, digital storage media, camera or imaging equipment seized in the initial search of the Premises;

10. Information regarding any numbers associated with the seized devices, the service provider and all data used by the service provider to identify the device, including the device's phone number, International Mobile Equipment Identity (IMEI), Mobile Equipment Identifier (MEID), Media Access Control (MAC) Address and other unique identifiers;

11. Evidence of other accounts associated with the seized devices including email addresses, social media accounts, messaging "app" accounts, and other accounts that may be accessed through the digital device that will aid in determining the possessor/user of the device, including any remote storage devices or accounts;

12. Evidence of the identity of the person in possession of the device on or about any times that items of evidentiary value, located pursuant to this warrant, were created modified, accessed or otherwise manipulated. Such evidence may be found in digital communications, photos and video and associated metadata, phone logs, documents, social media activity, and similar data;

13. Evidence of use of the seized device to communicate with co-conspirators or others about the above-listed crime(s), via incoming or outgoing calls, chat sessions, instant messages, text messages (either Short Message Service (SMS) or Multimedia Messaging Service (MMS)), app communications, social media, and other similar digital communications;

14. Any of the material listed above required that may exist in the unallocated portion of the device matching the above criteria.

This Court is authorized to issue this warrant pursuant to 15 M.R.S. §§ 55 & 56.

**Part III: My conclusion that such probable cause exists is based on the following factual information:**

A. **Introduction**

1. I, Matthew Estes, a Detective for Augusta Police Department make this affidavit in support of an application for a search and seizure warrant for the residence at 45 Cushnoc Drive, Augusta, Maine.

2. This affidavit is intended to show that there is sufficient probable cause for the requested search and seizure warrant and does not set forth all of my knowledge about this matter. The statements contained in this affidavit are based upon the following: my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of records related to this investigation; communications with others who have knowledge of the events and circumstances described herein; and information gained through my training and experience.

B. **Experience**

1. I, Matthew Estes, am a Detective with the Augusta Police Department. I have been a sworn law enforcement officer since 2008. I am a 2008 graduate of the Maine Criminal

Justice Academy (MCJA). I worked as a patrol officer for 7 years for the Augusta Police Department. Since September 2015, I have been assigned to the Augusta Police Department's Bureau of Criminal Investigation as a Detective. Your affiant has been involved in numerous investigations for misdemeanor and felony offenses, including homicide, robbery, burglary, sex offenses, computer crimes, property crimes, and drug trafficking. I have been trained in the use of the Internet Crimes Against Children (ICAC) system and I am familiar with the National Center for Missing and Exploited Children (NCMEC) and how their systems work. I have prepared and executed numerous search warrants for computer crimes at premises. I have led numerous investigations involving the use of digital media or computer systems in committing crimes. I am an affiliate of the Maine State Police Computer Crimes Unit and have worked on previous cases that involved writing this type of a search warrant.

C. **Information Regarding Digital Devices and Criminal Investigations**

1. Evidence of the crimes described in this affidavit could be contained in any type of digital device. The terms "digital device" and "device" include all devices capable of capturing and/or storing digital data, such as computers, portable electronic devices, tablets, digital cameras, modems, routers, external memory drives, thumb drives, cellular telephones, GPS navigation devices, etc. Data stored on digital devices and media can be easily transferred from one device or storage media to another.

2. Digital devices typically retain some evidence of all activity taken via the device or associated media; and, as such, could contain evidence of crime. For example, data, whether stored intentionally or unintentionally, can contain evidence of knowledge, intent, efforts to conceal, sell or dispose of evidence or proceeds of criminal activity, accomplice identity, association with victims, or geographic location of the device possessor at particular dates and times. This information can be in numerous forms, such as photographs; videos, address books or contact lists; or communications with others through means such as phone calls, email, instant messaging, social media, chat sessions, or other digital communications.

3. Evidence can remain on the device or media for indefinite periods of time after the communication originally took place, even if deleted by the user. Information deleted

by the user may be recovered by a forensic examiner throughout the working life span of the device. [See the Forensic section for more information.]

4. Digital data can be found in numerous locations, and formats. Evidence can be embedded into unlikely files for the type of evidence, such as a photo included in a document or converted into a PDF file or other format in an effort to conceal their existence. Information on devices and media can be stored in random order; with deceptive file names; hidden from normal view; encrypted or password protected; and stored on unusual devices for the type of data, such as routers, printers, scanners, game consoles, or other devices that are similarly capable of storing digital data.

5. Wholly apart from user-generated files and data, digital devices and media typically store, often without any conscious action by the user, electronic evidence pertaining to virtually all actions taken on the digital device, and often information about the geographic location at which the device was turned on and/or used. This data includes logs of device use; records of the creation, modification, deletion, and/or sending of files; and uses of the internet, such as uses of social media websites and internet searches/browsing.

6. Device-generated data also includes information regarding the user identity at any particular date and time; usage logs and information pertaining to the physical location of the device over time; pointers to outside storage locations, such as cloud storage, or devices to which data may have been removed, and information about how that offsite storage is being used. If the device is synced with other devices, it will retain a record of that action. Digital device users typically do not erase or delete this evidence, because special software or use of special settings are usually required for the task. However, it is technically possible to delete this information.

7. Data collected from digital devices belonging to victims of crimes, such as cell phones has been extremely helpful during criminal investigations. For example, victims of domestic violence crimes often express fears and/or concerns and document prior incidents of violence on digital media platforms. This information can lead police to suspects, provide motives, and help police identify evidence of such crimes. Similarly, it is becoming much more common for communications between a suspect and victim or a victim and witness to occur using a digital device and that data remains on the

device, whether in email, text, image or video, or the use of another communication application. It is becoming more common for the evidence of a crime to exist on a digital device because a threat was sent using a device or a witness recorded the actual crime as it occurred on a digital device.

8. Digital devices can also reveal clues to other locations at which evidence may be found. For example, digital devices often maintain logs of connected digital or remote storage devices. A scanner or printer may store information that would identify the digital device with which it was used. Forensic examination of the device can often reveal those other locations where evidence may be present.

9. As with other types of evidence, the context, location, and data surrounding information in the device data is often necessary to understand whether evidence falls within the scope of the warrant. This type of information will be important to the forensic examiner's ability to piece together and recognize evidence of the above-listed crimes.

10. Digital device programs frequently require passwords, phrases, codes, patterns, fingerprints, and/or user names to operate. Those may be kept inside a device/media, or outside in some other area known to the user. So, in addition to searching a digital device and media for evidence of the above-listed crime(s), investigators will need to search both the premises searched, and the digital device(s) for this information.

11. The forensic examiner may also need the following items in order to conduct a thorough and accurate search of the devices: computer hardware, software, peripherals, internal or external storage devices, power supplies, cables; internet connection and use information; security devices; software; manuals; and related material.

12. Modern digital devices and media can contain many gigabytes and even terabytes of data. Due to the potential for an extremely large volume of data contained in devices and media, and that fact that evidence can be stored/located in unanticipated locations or formats and/or embedded in other items stored on the device/media, investigators typically need to use specialized equipment in their search. Such large volumes of data also mean that searches can take days or even weeks to complete. For these reasons, I request authority to remove from the search location all digital devices and media that

could contain evidence authorized for seizure under the warrant for subsequent search pursuant to the terms of the warrant.

13. It has become common to back up documents and media on either an external hard drive or a cloud storage system. Once a user has defined the backup, that data is transferred without additional user input. Accordingly, data that previously existed on the device may still exist on a storage device.

14. Regarding portable electronic devices (PED) such as cellular phones and tablets:

   a. Courts have recognized that the majority of Americans possess and use PEDs, which include cellular telephones, and that most of those keep the phones within their reach at all times.

   b. Cellular telephones are used for, among other things, voice, text, email and SMS communications; accessing and posting to social networking websites, surfing the internet, taking and storing photographs, creating and storing documents, notes, music, mapping directions to places, etc. Courts have recognized that these devices are essentially small computers with vast storage capacities. Information deleted by the user can be recovered, years after deletion, upon examination of a cell phone's data. Data contained on a cell phone can often be critical evidence in a criminal investigation if properly preserved, accessed, and analyzed. Criminal investigators have discovered the following:

      1) Data stored on a PED can include user-created or saved data, such as contact lists, messages sent and received, images, audio and video files, personal calendars, notes, prescriptions, bank statements, videos, documents, and images; as well as device-generated data, such as user identity information, passwords, usage logs and information pertaining to the physical location of the device over time.

      2) Although data kept on a PED originally was restricted to the applications provided by the PED provider, it is now much more common to find that cellular phone users now download applications that will work without regard to the PED operating system, such as Google Maps can be used on an Apple iPhone.

3) Whether some data on the PED is evidence may depend on other information stored on the device, and the application of an examiner's knowledge about how the PED operates. Therefore, the context, location, and data surrounding information in the PED's data may be necessary to understand whether evidence falls within the scope of the warrant.

4) Subscriber or user information for a particular device is often useful in determining who possessed the device on a particular date and time. However, a more definitive way to determine the possessor of a device is to examine how the device is used over a period of days or weeks. The content on the device itself, over a period of time, provides vital evidence of the identity of the user of the device; such evidence can be found in communication content, email information, linked social media accounts, photos (selfies), video, and any location data on the device. Examination of all this data is necessary to accurately determine who possessed the device at dates and times critical to the investigation.

D. **Computers and Sexually Explicit Material (Child Pornography)**

1. Based on my knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, I know that computers, computer technology, and the internet have dramatically changed the manner in which child pornography is produced and distributed. I know that the crimes of possession and dissemination of "sexually explicit material" are defined in Maine statutes, but that "sexually explicit material" is more commonly referred to as child pornography. More specifically, I know that sexually explicit material refers to images of minors involved in sexually explicit conduct as defined in 17-A M.R.S. § 281. For purposes of this affidavit, the terms "sexually explicit material" and "child pornography" are synonymous.

2. Generally, based on my knowledge, training and experience, I know that computers and portable electronic devices may serve four functions in connection with child pornography: production, communication, storage and distribution.

a. Production: An individual can record sexually explicit conduct and produce child pornography by:

   1) using a web cam connected to a computer;

   2) using the camera on any portable electronic device, such as a cell phone or tablet; or

   3) using a digital camera and transferring any images taken when connected, either with a wire or wirelessly, to a computer or portable electronic device.

b. Communication: The Internet affords individuals interested in child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion, including Internet Relay Chat (IRC), instant messaging programs, bulletin board services, e-mail, and peer-to-peer file sharing (P2P). Individuals interested in child pornography can now meet online and communicate regarding where to obtain child pornography, how to share images, and how to avoid detection by authorities.

c. Storage:

   1) Locally: The ability for a computer, portable electronic device or a digital storage device to store images in digital form makes it an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. Images and videos of child pornography can also be stored on removable digital storage media, such as external hard drives, thumb drives, media cards, and the like, many of which are small, sometimes as small as ½ inch by ½ inch square, and highly portable. In addition, some storage devices are now disguised to look as a different item, such as a key, sunglasses, and jewelry. Data can also be stored on optical media such as CDs and DVDs created by a computer.

   2) Remotely: Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet portals such as Google Drive and Dropbox, among others. The online

services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. The "permanent" image resides with online resource and the user downloads the image or video for viewing but does not explicitly save the image on the device used to view the material. Evidence of such online storage of child pornography is often found on the user's computer or device.

d. Distribution: The same Internet or online service that allows individuals to communicate regarding child pornography allows the users to exchange child pornography. Those interested in child pornography can upload images or video clips directly from a digital camera to a computer. Once uploaded, they can easily be edited, manipulated, copied, and distributed. Paper photographs can be transferred to a computer-readable format and uploaded to a computer using a scanner. Once uploaded, they too can easily be edited, manipulated, copied, and distributed. A modem allows any computer to connect to another computer using a telephone, cable, or wireless connection. Through the Internet, electronic contact can be made to literally millions of computers around the world.

E. **Characteristics Common to Child Pornography Offenders**

1. **Common Characteristics:** Based upon my knowledge and experience in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know that there are certain characteristics common to individuals who use computers or the Internet to download, store, distribute, receive, and/or access with intent to view images of child pornography. While the purposes for using the sexually explicit material are the same, the easy access to the Internet and the proclivity of available distribution, such as P2P, has allowed or created two types of individuals who distribute, receive, and/or access with intent to view images of child pornography. One individual may download sexually explicit material using the easy access to the internet, view the material, and then delete it from his computer or portable electronic device. The other type of individual will download and store the material. While not every characteristic is found in each individual, the following are generally held in common:

a. Individuals who download, store, distribute, receive, and/or access with intent to view child pornography may receive a sexual response, sexual gratification, stimulation, and satisfaction from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, in person, in photographs, or other visual media; or from literature describing such activity.

b. Individuals who download, store, distribute, receive, and/or access with intent to view child pornography may correspond with and/or meet others online to learn how to find and/or share, information and materials with whom they have been in contact and who share the same interests in child pornography. Such correspondence demonstrates the individual's intent in obtaining material and negates any suggestion that child pornography images found on the computer were obtained by accident. Even if the material has been deleted, a forensic review may be able to retrieve the correspondence.

c. Individuals who would have knowledge of how to access hidden and embedded online Bulletin Boards (BB) would have gained knowledge of its location through online communications with others of similar interests. Other forums, such as BB, newsgroups, IRC chat and chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who use these types of forums are considered users that are more advanced and therefore more experienced in acquiring a collection of child pornography images.

d. Sexually explicit images of minors represent a currency among others with a sexual interest in minors and are used as a means of gaining acceptance, status, trust, and psychological support by exchanging, trading, or selling the images to other people with similar interests. Individuals are likely to maintain images of minors with whom they have had sexual contact in order to "relive" the event or as a means of control over the minor.

e. Individuals with a sexual interest in children view children as sexual objects and receive gratification from sexually explicit images of minors. They collect sexually explicit images of minors, and sometimes non-explicit images, which they use for their own sexual gratification and fantasy. They use these images as a means of reliving fantasies or actual sexual encounters.

f. Individuals with a sexual interest in children will and have used the Internet to gain access to children for the purpose of sexual exploitation. I also know, based on my training and experience, that suspects will make online contact via chat with other suspects to share their information on the sexual exploitation of children including where to watch children, how to gain access to children, how to desensitize victims to sexual abuse, how to hide their actions from law enforcement officials, how to store their child pornography and how to keep the victims from talking about the abuse. That information is maintained in the browser history and other areas on a computer until deleted or overwritten.

2. **Characteristics of an individual who stores material**:

a. Individuals who store, distribute, receive, and/or access with intent to view child pornography may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings of other visual media. Individuals who have a sexual interest in children or images of children often use these materials for their own sexual arousal and gratification. In some circumstances, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual act.

b. Individuals who store, distribute, receive and/or access with intent to view child pornography, generally prefer to store images in electronic formats such as computer files. The computer's ability to store images in digital format makes a computer or cell phone an ideal storage device for child pornography. Portable disks can contain thousands of child pornography images. Portable digital media are particularly well suited to conceal images of child pornography. In addition, advances in the storage of digital media facilitate the ease of transporting the material from one location to another. Digital media devices including, but not limited to, laptops, cellular phones and flash drives can be located in suspect's vehicles as they take the items with them when they travel from one location to another. In addition, keeping the material in digital form, and near at hand, avoids detection by other members of the household.

c. Likewise, individuals who store, distribute, receive, and/or access with intent to view child pornography often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at place under the collector's control, such as a residence or vehicle, to enable the individual to view the collection, which is valued highly.

d. Individuals with a sexual interest in children often will collect images of children even if the images are not sexually explicit. In some circumstances, the individual will start taking images of a child posing for pictures and the behavior is part of the "grooming" with the pictures becoming more explicit with time. The individual may keep the images as mementos of the progression. Those same images are useful in order to identify the victim when other sexually explicit images are found.

e. Individuals who store, distribute, receive, and/or access with intent to view child pornography prefer not to be without their child pornography for any prolonged time. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

3. **Characteristics of an individual who downloads material and deletes.**

a. Individuals who download, distribute, receive, and/or access with intent to view child pornography are increasingly using the Internet and/or cloud based (remote) storage as an extension of their own computer allowing offenders to download, view, and delete child pornographic files. This allows offenders to keep their files easily accessible from a remote location while making detection more difficult, whether from other users of the computer or from law enforcement. Even if the file is deleted locally, a forensic examination can oftentimes find evidence that the file was on the computer.

b. Individuals who download, distribute, receive, and/or access with intent to view child pornography can still have evidence of the method used to download the images even if the images have been deleted. For example, an individual who relies on a P2P network to search and retrieve images will still have information on the

computer or portable electronic device that the P2P software was loaded at one time, even if the individual uninstalls the software.

c. Individuals who download, distribute, receive, and/or access with intent to view child pornography can still have evidence of the material that is not easily accessible from the Internet or from remote locations. For example, the individual may save information locally for how to find favorite files, images of minors that are not easily found, or images that the individual has manufactured.

F. **Forensic review of digital evidence**

Based on my knowledge and experience in working with forensic analysts in the CCU and on information received from other individuals and other law enforcement officers as set forth below, I have learned the following:

1. Careful on site or off-site forensic examination of a computer, portable electronic device or other electronic data storage devices by a trained analyst, may result in the recovery of electronic data that has been stored on the device, even if the data was not intentionally stored, was deleted, was password-protected or encrypted, and often even if the device itself has been damaged. Depending upon the tools necessary, some examination may need to be done in a forensic laboratory. Forensic examination can also discover information regarding storage in a remote location.

2. Forensic examination of electronic data may require the use of software and/or written materials regarding the computer equipment and software that were used to store or retrieve the data, including owner's manuals, computer reference books, guides, written notes, and recorded passwords.

3. Such recoverable electronic data includes Internet history (including Internet browser history, search engine history, temporary Internet files), electronic communications (such as email and email attachments, chat room communications, writings created on word processing software, notepads, etc.), stored data files and folders, graphic visual images (such as photographs, movie clips and scanned images), personal calendars or diaries, and other electronic data that demonstrates the identity of the person who exercised dominion or control over the computer or its contents and where the crime occurred.

4. Such electronically stored data may also exist in the form of paper printouts that are stored on the premises.

5. That some of the forensic analysts employed by the CCU and utilized by other agencies are not sworn law enforcement officers.

6. Portable electronic devices, or mobile devices, perform an array of functions ranging from a simple telephone device to those of a personal computer. Designed for mobility, they are compact in size, very portable, battery-powered, and lightweight. People often carry their devices with them wherever they go using them for communication, web browsing, navigation, and data storage. Most mobile devices have a basic set of comparable features and capabilities.

7. Different mobile devices have different technical and physical characteristics (e.g., size, weight, processor speed, memory capacity). Mobile devices may also use different types of expansion capabilities to provide additional functionality. Furthermore, mobile device capabilities sometimes include those of other devices such as handheld Global Positioning Systems (GPS), cameras (still and video) or personal computers. Overall, mobile devices can be classified as "feature phones" which are primarily simple voice and messaging communication devices or "smartphones" which offer more advanced computing capabilities and services similar to those of a personal computer, such as multimedia for example. Expansion capabilities can include additional storage media such as Secure Digital (SD) cards and/or so called "cloud storage" which is data storage service at a remote server accessible by wireless internet access.

8. Forensic examination of electronic data stored on a computer or such expansion media attached to a portable electronic device ordinarily involves making an exact duplicate image of the electronic data storage device(s) (i.e., hard drives, compact disks, floppy disks, and other digital storage media) and examining the duplicate image rather than the original storage device itself, so as not to cause any changes to the stored electronic data. That is the customary and accepted method of forensic examination on that type of device.

9. Forensic examination can also include on scene review and capture of the current Random Access Memory (RAM) which is lost if the device is powered off. There are

now forensic tools which allow extraction of RAM and stored memory while the device is still running.

10. Mobile device data extraction or acquisition depends greatly on the device type and the forensic tool used that is compatible with the device. For example, Cellebrite's forensic tools are not compatible with all devices. The amount of data and technique used to acquire it is likewise dependent on the type and technique. Such acquisitions can be categorized in primarily four general categories: manual, logical, file system extraction and physical. Manual extraction involves recording, without a forensic tool, information brought up on a mobile device screen in the same fashion that a user would access stored information and other features, i.e. call logs, text messages, photos, e-mails etc. Logical extraction involves acquiring data that the user has access to such as, call logs, text messages, emails, photos and videos, etc., but it is extracted by a forensic tool. File system extraction attempts to copy the file structure on the device including subfolders, hidden folders, and may sometimes include deleted material. Physical extraction is the most robust and includes all of the material of the logical extraction but includes the deleted data still present on the device. Other more invasive techniques entail the examination, extraction, and/or recording a copy or image of a physical store (e.g., a memory chip) and are generally used as a last resort when less invasive methods are not effective (damaged, locked or forensic tools otherwise unsupported).

11. Data acquired by more advanced techniques, including a physical extraction, may present the analyst with artifacts or fragments of files previously deleted by the user. Such artifacts, if located in unallocated space, will not include a date and time reference but can be otherwise attributable to relevant facts or events known to investigators based on the content still available. For example, an email may be retrieved with the addressed recipients email address but the date the email was sent may have been overwritten.

12. I am aware, from discussions with members of the Maine State Police Computer Crimes Unit, that a user of any digital device can manipulate the date and time of the device in such a way that it improperly represents the date and time of an event. In that case searching by date and time would be forensically unreliable.

13. I would also add that Computer Forensic Analysts at the Maine State Police Computer Crimes Unit in most instances cannot extract the requested information from the phone by date range.[1] All information in the phone is exported and may be reviewed by the forensic analyst, the analyst and investigator or provided to the requesting agency. The analyst, the analyst and investigator or, if provided to the agency, the agency will search through the exported content and only choose as evidence that which falls under the warrant.

14. Searching computer systems for the evidence described in Part II may require a range of data analysis techniques. In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories, encode communications to avoid using key words, attempt to delete files to evade detection, or take other steps designed to frustrate law enforcement searches for information. These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or peruse every file briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, the forensic analyst intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Part II.

G. **Specific Probable Cause**

1. Based on my knowledge and experience and on information received from other individuals and other law enforcement officers as set forth below, I have learned the following:

2. I am a Detective for the Augusta Police Department. I am currently investigating the dissemination and or possession of sexually explicit images of individuals under the age

[1] Cellebrite has only recently provided the ability to extract by date range, but it only works on a logical extraction which ignores all data in unallocated space. If a person is attempting to hide or delete material, it will be in the unallocated space. Customary forensic analysis suggests using a physical extraction when possible.

of 16 years of age (child pornography), via the Snapchat account associated with the email address bigadel2005@yahoo.com and phone number 207-420-5687.

3. On July 31, 2025, at approximately 1213 hours UTC, the National Center for Missing and Exploited Children (NCMEC) received a CyberTip regarding apparent child pornography. The NCMEC CyberTip report number is 217257667 and was submitted by Electronic Service Provider (ESP) Snapchat in accordance with federal law, 18 U.S.C.A. § 2258A. Snapchat identified the account associated with the apparent child pornography as Yahoo email address bigadel2005@yahoo.com and the phone number 207-420-5687 with the Snapchat username of "bigadel20051". Snapchat indicated that this account was used to upload one (1) file of apparent child pornography. The date the file was uploaded is listed as being July 31, 2025, at 12:13:19 UTC.

4. NCMEC is a nonprofit organization that provides services to families and professionals that relate to the abduction and sexual exploitation of children. NCMEC also operates the CyberTipline and the Child Victim Identification Programs to assist law enforcement officers and others in identifying and rescuing victims of child exploitation and child pornography. As part of the NCMEC directives, the NCMEC works with electronic service providers (ESP) and remote computing service providers, such as Google, to reduce the dissemination of child pornography images and or videos on the internet. When an ESP becomes aware of suspected child pornography images and/or videos, the ESP representative may view the images and/or videos in question to determine if the images and/or videos is child pornography and thus a violation of the ESP's use agreement with the user(s). If the image and or video is deemed by the ESP representative to be child pornography, the ESP will file an electronic report with the NCMEC. The reporting ESP will provide in the NCMEC report samples of the child pornography images and/or videos, IP addresses captured at the date and time of the child pornography file being uploaded by the user, and any registration information (if available). NCMEC will then research more publicly available information based on the information provided to them by the ESP to determine, if possible, the identification and or geographic location of the user uploading the child pornography images and or videos in order to forward the report to the appropriate jurisdiction. NCMEC will then forward their report to the Regional Internet Crimes Against Children (ICAC)

commander for further investigation. The Maine Computer Crimes Unit is the regional ICAC for Maine. In this case, NCMEC forwarded the MSP CCU the case files associated with CyberTip 217257667.

5. When NCMEC received the files from Snapchat they viewed the entire contents of the uploaded files.

6. A Grand Jury Subpoena was submitted through the Maine Attorney General's Office to identify the subscriber for phone number 207-420-5687, which is serviced by U.S. Cellular.

7. U.S. Cellular responded to the Grand Jury Subpoena indicating that the customer's name on the account is Adel Al Rashid with an address of 15 Hope Way, Unit 1, Augusta, Maine. The account has been active since July 31, 2017. The email address associated with the account is listed as bigadel2005@yahoo.com.

8. It should be noted that the APD is an affiliate of the MSP CCU. Furthermore, various detectives (including myself) from the APD have received training by the CCU and are assigned credentials to access the Internet Crimes Against Children Data System (IDS). IDS is a data system that provides case agents with access to files related to various cases assigned by the CCU. I accessed and reviewed the files associated with this investigation.

9. In reviewing the CyberTip as well as the ICAC system I found that the CyberTip states there is one (1) file that was uploaded that appear to be Child Sexual Abuse Material (CSAM). I confirmed the information listed above regarding the account and upload date and time.

10. In reviewing the file that is of CSAM I was able to confirm this video appears to be CSAM. The video shows a very young female, who appears to be prepubescent lying on her back with her vagina exposed. The evidence that the child is prepubescent is that she does not have any signs of pubic hair growth as well as the size of her body being small and child like. Based on my training, education and experience I would say this child is under the age of 10. In the video there is an adult performing oral sex on the child. This video has a hash value of "0d7ad586f3bfc33a65714d23725b9b0a". The file

name in the NCMEC report is listed as bigadel20051-null-aa14c9b1-3bcd-5dff-bfbc-ab2c7890837b~21067-bc80212f60-content.mp4.

11. I emailed NCMEC Technical Support and asked if the child in the video had been identified and they advised it had not. They did however state that the video has been circulating since 2016.

12. The First Circuit in *United State v. Sheehan*, 70 F.4th 36 (1st Cir. 2023), indicated that the language in *United States v. Brunette*, 256 F.3d 14 (1st Cir. 2001), that an image should be attached for judicial review, was dictum and the issue is whether the description establishes probable cause. Accordingly, if the image or video clearly exhibit a sexual act, bestiality or masturbation, our legal counsel has advised to not attach an exhibit in order to avoid further exploitation of the victim and to limit those exposed to the image. When there is a subjective issue of whether the image is "lewd," requiring a review of the Dost factors, the image will be attached to the affidavit.

13. On October 29, 2025, I spoke with Adel Al Rishid via the 207-420-5687 phone number and confirmed he is the user of this number. I also confirmed that he lives at 45 Cushnoc Drive. In speaking with Adel, I did not make him aware of this investigation.

14. As indicated above in the section on digital devices, the small size and capabilities of cell phones are making them much more likely to contain an individual's sexually explicit material. It is becoming more common for an individual to either search for or collect the sexually explicit material on their phone using applications, and the phone is usually kept on their person, nearby, or in a vehicle. I know that Snapchat is most often used as via an application on a cellular device.

**Part IV: Based on my education, training and experience, and the facts set forth in this affidavit, there is probable cause to believe, and I do believe, the following:**

A. Based on the images found by Snapchat and referred to the Maine State Police Computer Crimes Unit, a device or devices was used to upload a video using Snapchat. The video appears to be CSAM. The investigation revealed that the phone number associated with the Snapchat account belongs to Adel Al Rishid. The email has the name Adel in it and Adel lives at 45 Cushnoc Drive, Augusta, Maine. Based on the characteristics of a person who collects child pornography, that evidence is still

discoverable and that a device capable of connecting to the Internet is located at 45 Cushnoc Drive, Augusta, Maine, as described above in Part I, was used to commit offenses of possession of sexually explicit material in violation of 17-A M.R.S. § 284 and/or dissemination of sexually explicit material in violation of 17-A M.R.S. § 283

B. The residence, as described above in Part I, contains computers, portable electronic devices, computer-related equipment, and other evidence, as described above in Part II, that were used as instrumentalities in or that contain evidence of the commission of the crimes of possession of sexually explicit material.

C. If possible, a forensic examiner will accompany the affiant at the time of the search. If so, a brief preview of the computers will be done to limit the number of devices seized. If the item requires more time or contraband is found, the device will be taken to the Computer Crime Unit for additional examination. Careful off-site forensic examination of a computer or other electronic data storage devices by a trained examiner in a forensic laboratory, will result in the recovery of electronic data that has been stored on the computer, even if the data was not intentionally stored, was deleted, was password-protected or encrypted, and often even if the computer itself has been damaged.

D. If at the time of the execution of the approved search warrant, the residents of 45 Cushnoc Drive, Augusta, Maine, are not present, attempts to notify will be made. As has been the unit's normal procedure, any residents who do arrive will be searched pursuant to this warrant.

E. This affidavit had been reviewed by AAG Andrew Berggren

## Part IV: SPECIAL REQUESTS

A. **NOTICE**

1. I further request that the Court order that providing the inventory and warrant to the subject at the time of seizure in compliance with MAINE RULES OF UNIFIED CRIMINAL PROCEDURE Rule 41(g) is a means reasonably calculated to be effective in accordance with M.R.S. Title 16 § 649(1).

B. **Use of Civilians**

1. I respectfully request that civilian employees be authorized to assist in this search warrant at the scene to collect digital evidence.

2. I further request that the warrant authorize the subsequent examination of the contents of any seized computer equipment by computer forensic examiners from the Maine State Police Computer Crimes Unit, or any other State or federal law enforcement agencies qualified to do so, and that it authorize the assistance of civilian employees of such law enforcement agencies.

WHEREFORE, I pray that a warrant may issue authorizing a search of the Property/Premises described above in Part I for the Property/Evidence described above in Part II, and that if such Property/Evidence be found that it shall be seized.

I hereby swear under pains and penalties of perjury that the facts set forth in this affidavit are true and correct to the best of my knowledge, information, and belief.

Dated: 11/12/2025

Matthew Estes
a Detective
Augusta Police Department

Appeared before me under oath on this date the above-named Matthew Estes, signed, and swore to the truth of the facts contained in the foregoing instrument.

Dated: 11/12/25

District Court Judge/~~Superior Court Justice~~

A True Copy Attest:
Tamara M. Rueda
Clerk

**STATE OF MAINE**
**KENNEBEC, ss.**

**UNIFIED CRIMINAL COURT**
**LOCATION: Augusta**
**DOCKET NO. SW-25-157**

**IN RE: SEARCH WARRANT FOR THE AUGUSTA RESIDENCE AND DIGITAL MEDIA AT 45 CUSHNOC DRIVE**

**SEARCH WARRANT**
**[M.R.U. Crim. P. 41 & 41B]**

To: Any officer authorized by law to execute this Search Warrant;

Affidavit having been made before me by Matthew Estes of the Augusta Police Department; and as I am satisfied that there is probable cause to believe that grounds for the issuance of a search warrant exist; you are hereby commanded to search the place(s) or person(s) specified herein and, if the specified property is found, to seize such property and prepare a written inventory of the property seized in 14 days.

**Part I: Located on or about the property/premises described below, namely:**

A. The premises to be searched, 45 Cushnoc Drive, is in the city of Augusta, County of KENNEBEC, Maine. The residence is a single-family residence with half brown half blue colored wood siding and a grey shingled roof. The residence has an attached two car garage as well. The residence is approximately 50 feet off the road on the west side of Cushnoc Drive. The adjacent photograph depicting the premises was taken by Matthew Estes on October 29, 2025.



B. The premises include attics, basements, attached or detached garages, storage lockers, safes, buildings attached or unattached that are readily accessible to, under the control of, or used by the person(s) residing at 45 Cushnoc Drive, Augusta, Maine.

C. Any persons located on the premises at the time of or who arrive during the execution of the search warrant, excluding any unrelated individuals such as UPS, FedEx, etc. unless proven to be related to the investigation, including the following listed person(s):

1. Adel Al Rashid, DOB: 01/27/1979, 45 Cushnoc Drive, Augusta, Maine or wherever located in the State of Maine.

D. Any vehicles located at the residence belonging to or under the control of any residents 45 Cushnoc Drive, Augusta, Maine, including the below listed vehicles:

**Part II:** There is certain property/evidence, namely:

A. The following property to be seized from the persons, vehicles, and premises at 45 Cushnoc Drive, Augusta, Maine:

1. Images of sexually explicit conduct involving individuals under 16 years of age (commonly known as child pornography) in any form;
2. Records or images in any form pertaining to the manufacture, possession or receipt of sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography);
3. Records or images in any form relating to the identity of the individuals under 16 years of age depicted in any seized images;
4. Records or images in any form reflecting personal contact with any of the individuals under 16 years of age depicted in any seized images;
5. Records or images in any form reflecting access to, or payment for access to, websites containing or relating to sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography);
6. Computers, portable electronic devices, and digital storage media of any kind. As used both above and below, the terms "computers, portable electronic devices and digital storage media" include any electronic system or device capable of storing and/or

processing data in digital form, including: central processing units; laptops, tablets or notebook computers; wireless communication devices such as cellular telephones: peripheral input/output devises, routers and networking equipment and drives intended for removal media; related communications devices such as modem, cables, and connections; storage media such as hard disk drives, optical media, thumb drives, magnetic tapes, and memory chips; and security devices;

7. Camera or imaging equipment of any kind, as well as any storage medium that could be used to store images, whether digital, film or paper;

8. Records or images in any form suggesting a sexual interest in individuals under 16 years of age and their activities. These items are to include collections of photographs or magazines containing images of children and/or adolescents or child erotica;

9. Records in any form indicative of occupancy or ownership of the premises described in the search warrant (the Premises);

10. Records or images in any form that indicate ownership or use of computers, portable electronic devices, digital storage media, camera or imaging equipment found in the Premises; and

11. To further search the computers, portable electronic devices and digital storage media seized during the search of the persons, vehicles, and premises at 45 Cushnoc Drive, Augusta, Maine for the following:

B. Images of sexually explicit conduct involving individuals under 16 years of age (commonly called child pornography), in any form;

C. Evidence of use of the device to conduct Internet searches relating to sexually explicit conduct with a minor children;

1. Photographs, images, videos, and related data depicting manufacture, possession or receipt of sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography) created, accessed, read, modified, received, stored, sent, moved, deleted or otherwise manipulated;

2. Records or images in any form relating to the identity of the individuals under 16 years of age depicted in any seized images;

3. Records or images in any form reflecting personal contact with any of the individuals under 16 years of age depicted in any seized images;

4. Records or images in any form reflecting access to, or payment for access to, websites containing or relating to sexually explicit material as prohibited in 17-A M.R.S. §§ 283 and 284 (commonly called child pornography);

5. Records or images in any form suggesting a sexual interest in individuals under 16 years of age and their activities. These items are to include collections of photographs or images containing images of children and/or adolescents and child erotica;

6. Records in any form indicative of occupancy or ownership of the premises described in the search warrant (the Premises);

7. Records or images in any form that indicate ownership or use of the computers, portable electronic devices, digital storage media, camera or imaging equipment seized in the initial search of the Premises;

8. Information regarding any numbers associated with the seized devices, the service provider and all data used by the service provider to identify the device, including the device's phone number, International Mobile Equipment Identity (IMEI), Mobile Equipment Identifier (MEID), Media Access Control (MAC) Address and other unique identifiers;

9. Evidence of other accounts associated with the seized devices including email addresses, social media accounts, messaging "app" accounts, and other accounts that may be accessed through the digital device that will aid in determining the possessor/user of the device, including any remote storage devices or accounts;

10. Evidence of the identity of the person in possession of the device on or about any times that items of evidentiary value, located pursuant to this warrant, were created modified, accessed or otherwise manipulated. Such evidence may be found in digital communications, photos and video and associated metadata, phone logs, documents, social media activity, and similar data;

11. Evidence of use of the seized device to communicate with co-conspirators or others about the above-listed crime(s), via incoming or outgoing calls, chat sessions, instant messages, text messages (either Short Message Service (SMS) or Multimedia

Messaging Service (MMS)), app communications, social media, and other similar digital communications;

12. Any of the material listed above required that may exist in the unallocated portion of the device matching the above criteria.

This Court is authorized to issue this warrant pursuant to 15 M.R.S. §§ 55 & 56.

**Part III: SPECIAL PROVISIONS**

A. **NOTICE**

The Court orders that providing the inventory and warrant to the subject at the time of seizure in compliance with MAINE RULES OF UNIFIED CRIMINAL PROCEDURE Rule 41 (g) is a means reasonably calculated to be effective in accordance with M.R.S. Title 16 § 649(1).

B. **Use of Civilians**

It is further authorized that in the event that computers, portable electronic devices or electronic data storage devices or email content are in fact seized, they may be examined by a trained forensic examiner from the Maine State Police Computer Crimes Unit, or any other State or federal law enforcement agency qualified to do so, either at the place of seizure or upon removal of the equipment to a forensic lab, or both. This warrant further authorizes the exporting of data from any digital device for subsequent forensic examination. It is further authorized that civilian employees of the Maine Department of Public Safety, or any law enforcement agency may assist in the execution of this warrant. I respectfully request that civilian employees be authorized to assist in this search warrant at the scene to collect digital evidence.

C. **DAYTIME WARRANT ONLY**

This warrant shall be executed between the hours of 7:00 A.M. and 9:00 P.M., and shall be returned, together with a written inventory, within 14 days of the issuance hereof, to the Maine District Court located in Augusta, Maine.

DATED: 11/12/25

Court Judge / ~~Justice of the Peace~~

A True Copy Attest:

Tamara M. Rueda
Clerk